**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Luz PAULINO-SANTOS, Michael RING, Betty VEGA, and NEW YORK INTEGRATED NETWORK, | No. |
| | **CLASS ACTION COMPLAINT** |
| *Plaintiffs,* | |
| v. | |
| METROPOLITAN TRANSIT AUTHORITY, NEW YORK CITY TRANSIT, John LIEBER, and Richard DAVEY. | |
| *Defendants.* | |

Plaintiffs and the proposed class, by and through their attorneys, allege as follows:

Preliminary Statement

1.      This class action seeks to remedy systemic discriminatory practices in the Access-A-Ride program. Access-A-Ride is a "paratransit" system that provides public transit to riders who are unable to use fixed-route services like subways and buses because of their disabilities.

2.      Federal and local disability rights laws mandate meaningful access to public transit for people with disabilities. The Americans with Disabilities Act (ADA) explicitly provides that it is "considered discrimination" on the basis of disability for paratransit not to be "comparable," to transportation services provided to nondisabled individuals, and specifically for paratransit to have "response time[s]" that are not "comparable, to the extent practicable," to the public transit available to individuals without disabilities.  42 U.S.C. § 12143(a), (c)(1).

3.      Under these laws, people with disabilities have the right to travel within the same area that the public transit system for nondisabled people serves on paratransit if their disabilities prevent them from taking fixed-route transit like subways and buses.

4.      Although a recent settlement commits the MTA to provide stair-free access to most New York City subway stations in approximately thirty years,[1] the current subway system remains largely inaccessible to many people with disabilities.

5.      Indeed, some people with disabilities will never be able to use "fixed-route" transit, such as subways and buses, even if all the subways have elevators.

6.      As explained below, the individual named plaintiffs, and many of the members and individuals served by plaintiff New York Integrated Network ("NYIN"), are unable to use subways and buses consistently, because of their disabilities. For example, disabilities that affect the immune system may prevent safe use of crowded transit; neurological disorders may make slippery or bustling platforms unsafe; cognitive disabilities may prevent safe use of complex fixed-route navigation; individuals with autism may experience sensory overload in a crowded and noisy subway.

7.      Regulations implementing the ADA expressly preclude an "operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons," including "[s]ubstantial numbers of trips with excessive trip lengths." 49 C.F.R. § 37.131(f)(3).

---

[1] The settlement agreement, announced in June 2022, resolved two cases: *Center for Independence of the Disabled, New York, et al.* v. *Metropolitan Transportation Authority, et al.* No. 153765/2017 (N.Y. Sup. Ct. N.Y. Co.); *De La Rosa et al.* v. *Metropolitan Transportation Authority et al.* No. 19-cv-04406 (ER) (S.D.N.Y.). *See* Press Release, ICYMI: Governor Hochul Announces MTA and Accessibility Advocates Agree on Historic Plan for Expanding Accessibility in the New York City Subway System (last updated June 22, 2022, 8:45 p.m.), https://new.mta.info/press-release/icymi-governor-hochul-announces-mta-and-accessibility-advocates-agree-historic-plan. The proposed agreement, which received final approval from the Southern District of New York and the New York State Supreme Court on April 25, 2022, is available on Disability Rights Advocates' website. *See* DISABILITY RIGHTS ADVOCATES, *Settlement Agreement*, https://dralegal.org/wp-content/uploads/2022/06/Final-Agreement-with-All-Signatures-ACC.pdf (last accessed Apr. 25, 2023).

1284267 v1

8.      This lawsuit challenges discriminatory service provided to the 170,000 people registered for Access-A-Ride and the many others who are deterred from riding (collectively, "Paratransit Users").

9.      Defendants, the Metropolitan Transit Authority, New York City Transit, and their chief executives, named in their official capacities (collectively, "MTA") operate an Access-A-Ride system that is not comparable to the bus and subway service offered to nondisabled New Yorkers.

10.      On October 17, 2022, the Department of Justice issued a letter detailing findings of an investigation of the Access-A-Ride program.[2] According to this DOJ Letter, the Access-A-Ride service fails to provide the required comparable service, and, specifically, engages in an operational pattern or practice that significantly limits the availability of service.[3]

11.      The discrimination challenged in this lawsuit includes the following policies and practices:

a.      **Next Day Rules:** Paratransit Users must reserve trips "one to two days in advance" and at least "by 5 p.m. the day before you wish to travel."[4] They must cancel reservations two hours in advance or face penalties.[5] These advance scheduling requirements and associated practices are collectively referred to as the "Next Day Rules."

---

[2] *See generally* Letter of Findings from Damian Williams, U.S. Att'y, S.D.N.Y., U.S. Dep't of Just., to Paige Graves, General Counsel, Metro. Transpo. Auth. (Oct. 17, 2022), https://www.justice.gov/crt/case-document/letter-findings-new-york-city-transit-authoritys-access-ride-program [hereinafter DOJ Letter].
[3] *Id.* at 1-2.
[4] *Frequently Asked Questions About Our Paratransit Service*, METRO. TRANSPO. AUTH., https://new.mta.info/accessibility/paratransit/welcome-to-access-a-ride-paratransit-service/faqs (last accessed Apr. 24, 2023).
[5] *Access-A-Ride Policy for No-Shows and Late Cancellations*, METRO. TRANSPO. AUTH., https://new.mta.info/accessibility/paratransit/policies-and-forms/access-a-ride-policy-for-no-shows-and-late-cancellations (last accessed Apr. 24, 2023).

1284267 v1

   b. **Wait Time:** Paratransit Users also must—by written policy—accept a pickup time "up to an hour earlier or later than the time requested."[6] And, Paratransit Users are required, again by written policy, to wait for their rides for at least thirty minutes after their scheduled pickup times before those rides can be considered late. The DOJ found that almost fourteen percent of riders are dropped off late for appointments, and almost forty percent are dropped off more than thirty minutes early.[7] Indeed, the MTA deems drop-offs to be "on time" even if they are after a rider's expressly designated appointment time.[8] These waiting requirements and associated practices are collectively referred to as the "Wait Time Rules."

   c. **Routing/Trip Length:** Paratransit Users are routinely and unpredictably driven all over the city on excessively long routes. Authorized "maximum ride times" purport to estimate how much time riders can expect to spend on Access-A-Ride allegedly based on the distance they are traveling. They range from fifty minutes for a trip distance of 0-3 miles to more than two hours for a trip distance of 12-14 miles.[9] The DOJ analysis found that the large majority of the travel times allowed by this policy were excessive when compared with a fixed-route trip. It further found that a measurable percentage of trips are even longer than these already excessive limits.[10]

---

[6] *Making a Reservation and Managing Trips*, METRO. TRANSPO. AUTH., https://new.mta.info/accessibility/paratransit/making-a-reservation-and-managing-trips (last updated Apr. 7, 2023).
[7] DOJ Letter, *supra* note 2, at 4.
[8] *Id.*
[9] *On the Day of Your Trip*, METRO. TRANSPO. AUTH., https://new.mta.info/accessibility/paratransit/on-the-day-of-your-trip (last updated Oct. 1, 2020).
[10] DOJ Letter at 5.

1284267 v1

12.     In contrast, New York City's basic guidelines for the subway provide for wait times of ten minutes during peak hours, twelve minutes during non-peak hours, and twenty minutes during overnight hours.[11]

13.     Users of the fixed route system also benefit from clear, published routes and routing assistance. On information and belief, in its fixed route system the MTA designs routes and recommends routing to take people where they are going as efficiently as possible. Unlike paratransit users, fixed route riders can choose the most efficient available route to reach their destinations.

14.     It is eminently practicable for the MTA to provide a far more comparable Access-A-Ride service. Indeed, the MTA itself has a pilot program adopted in 2017 which provides a select few Paratransit Users with on-demand service which, in the MTA's words, is "similar to popular on-demand ride services such as Uber, Lyft and others."[12]

15.     However, the MTA has narrowly limited the on-demand program to 1,200 of the more than 170,000 annual Access-A-Ride registrants with no application process or other procedural means for determining who or how to get access to the pilot program.

16.     The MTA has threatened to end or limit even the limited on-demand access.

17.     The result is severe travel limitations for people with disabilities that do not exist for nondisabled subway and bus riders. Many eligible Paratransit Users, including named plaintiffs, have to give up errands, work meetings, social engagements, worship, civic participation, medical visits or other trips because their public transit is not indeed comparable.

---

[11] *MTA New York City Transit and MTA Bus Company System-wide Service Standards*, METRO. TRANSPO. AUTH., http://web.mta.info/mta/compliance/pdf/Title-VI-NYCT-Bus-Policies.pdf (last accessed Apr. 24, 2023).

[12] Press Release, Metropolitan Transportation Authority, MTA Offers First Ever Real-Time, On Demand Service for Access-A-Ride Users (Nov. 13, 2017), http://www.mta.info/press-release/nyc-transit/mta-offers-first-ever-real-time-demand-service-access-ride-users.

18.     This result is exactly what the ADA and other disability rights laws were designed to avoid. The MTA's scheduling policies and routing deny comparable service. The law defines that denial as discrimination against people with disabilities. This case asks the Court to remedy that discrimination.

Jurisdiction and Venue

19.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

20.     The Court has jurisdiction over pendant state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction). The state law claims are part of the same case or controversy as the federal claims because they arise out of the same circumstances.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391. A substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

Parties

22.     Plaintiff Lucy (Luz) Paulino-Santos is a fifty-six-year-old dental office manager who lives in Inwood, Manhattan. She has used Access-A-Ride since 2017, when she developed a nerve condition in her spine that causes difficulty walking and standing, including severe pain. She is not able to take even stair-free subway or bus services because of her disability.

23.     Plaintiff Michael Ring is a fifty-nine-year-old who lives in Brooklyn, New York with his family. He has been using Access-A-Ride since 2014 because of a neurological disorder that causes mobility impairment. He prefers to use the subway, but various conditions including crowding (he cannot safely stand in the subway) and weather (he cannot safely navigate slippery stairs or platforms) cause him to rely on Access-A-Ride for about half of his travel.

1284267 v1

24.     Plaintiff Betty Vega is a seventy-one-year-old semi-retired music producer who lives in Brooklyn, New York. She started using Access-A-Ride fifteen years ago because of knee surgery, and continues to rely on it because of arthritis. She uses a cane to walk. She cannot use the subway because of her disability.

25.     Plaintiff New York Integrated Network ("NYIN") is a nonprofit coalition of more than a dozen agencies providing a variety of services across New York City, Long Island, Westchester, and the Mid-Hudson Valley. Since 2012, NYIN has developed and promulgated new and innovative care models for people with multiple disabilities, including cognitive, developmental, and physical disabilities, such as autism, cerebral palsy, spina bifida, Down syndrome, and other neurological impairments. These care models are centered on stability, efficiency, equity, community inclusion, and quality-of-life best practices for people with disabilities and their families.

26.     Defendant MTA is a public benefit corporation chartered by the New York State Legislature.

27.     The MTA operates the largest transportation network in North America, serving a population of more than fifteen million people in the 5,000 square mile area covering New York City, Long Island, southeastern New York State, and Connecticut.

28.     Defendant John Lieber, sued in his official capacity, is the Chair and Chief Executive Officer of the MTA.

29.     Defendant New York City Transit Authority ("NYCT"), a subsidiary of the MTA, is a public benefit corporation chartered by the New York State Legislature.

30.     Defendant Richard Davey, sued in his official capacity, is the President of NYCT.

1284267 v1

31.     All defendants are recipients of federal financial assistance to operate their transportation program and services within the meaning of Section 504 of the Rehabilitation Act.

Factual Allegations

**A. The Access-A-Ride Program**

32.     Access-A-Ride was first established in New York in 1984 to provide public transportation to people previously excluded from the system. It covers transit for people who are not able to take fixed-route service (subway, bus, or train) throughout all five New York City boroughs.[13] Coverage also includes a corridor within three-quarters of a mile of fixed-route service across the border into parts of Nassau and Westchester counties.

33.     In 1990, the Americans with Disabilities Act (ADA) incorporated paratransit in its civil rights mandates. This requirement was based on broad, bipartisan recognition that "providing a transportation system for the disabled was deemed a true key to integrating the disabled into society."[14]

34.     Hundreds of thousands of New Yorkers rely on Access-A-Ride. According to MTA data, as of November 1, 2022, there were more than 173,000 registrants for Access-A-Ride. Between November 2021 and November 2022, riders took hundreds of thousands of trips per month, totaling more than 6,500,000 rides in the twelve-month period.[15]

35.     People in low- and middle-income neighborhoods, who cannot afford to pay for ride services or taxis, are particularly reliant on Access-A-Ride.[16]

---

[13] *Guide to Access-A-Ride Paratransit Service*, METRO. TRANSPO. AUTH., https://new.mta.info/document/42246 (last accessed Apr. 14, 2023).

[14] *Liberty Res., Inc. v. Se. Pennsylvania Transp. Auth.*, No. 99-4837, 2001 WL 1047061, at *7 (E.D. Pa. Aug. 30, 2001).

[15] MTA Daily Ridership Data: Beginning 2020, OPENDATA NY, https://data.ny.gov/Transportation/MTA-Daily-Ridership-Data-Beginning-2020/vxuj-8kew (last updated Apr. 24, 2023).

[16] *See* SARAH M. KAUFMAN ET AL., BRINGING INNOVATION TO PARATRANSIT 7 (2017), https://wagner.nyu.edu/rudincenter/2017/12/new-report-bringing-innovation-paratransit.

36.     Access-A-Ride accounts for a small percentage of the MTA's operational budget. The MTA operating budget is about $19 billion as of 2022.[17]

**B.  Service Is Not Comparable**

37.     The Next Day rules, wait times, and routing/trip length, mean that, by the MTA's express design, Paratransit Users are not provided service that is comparable to bus or subway service.

38.     Paratransit Users generally must schedule rides by at least 5 p.m. the day before they are needed under the Next Day rules. Therefore, they must have all of their travel for a particular day planned in advance with no room for the spontaneous trips, gatherings, or changes-of-plans that are characteristic of daily life.

39.     There is, of course, no next-day scheduling requirement for nondisabled bus and subway riders.

40.     Paratransit Users are also subjected to extended Wait Time.

41.     When scheduling their rides, Paratransit Users have the option of giving Access-A-Ride a pickup time or an appointment time.

42.     When requesting a pickup time, Paratransit Users tell Access-A-Ride what time they would like to be picked up from their pickup locations. Access-A-Ride then gives the Paratransit User a computer-generated "scheduled pickup time" at which their Access-A-Ride vehicle should arrive at their pickup location, purportedly based on the Paratransit User's requested time. With a pickup time, Paratransit Users cannot dictate or otherwise predict or control what time they will be dropped off at their destinations.

---

[17] *MTA Operating Budget Basics*, METRO. TRANSPO. AUTH., https://new.mta.info/budget/MTA-operating-budget-basics (last accessed Apr. 14, 2023).

1284267 v1

43.     Pursuant to Access-A-Ride policy, Paratransit Users may be required to accept a pickup time that is an hour earlier or later than the time the Access-A-Ride customer requested.

44.     When requesting an appointment time, Paratransit Users tell Access-A-Ride what time they need to be at their destination. Access-A-Ride then gives the Paratransit User a computer-generated scheduled pickup time for when their Access-A-Ride vehicle should arrive at the pickup location, purportedly based at least in part on the distance between the Paratransit user's pickup and drop-off locations. While Paratransit users are supposed to be dropped off at their locations by their appointment times, that is often not the case.[18]

45.     In sum, whether using pickup or appointment times, Paratransit users must routinely accept waits of more than an hour for pre-scheduled rides, as a matter of explicit MTA policy. By design, in order to travel at all, riders must accept a scheduled pickup time that is potentially an hour or more away from their requested travel time *for each trip*—before and after work, meetings, doctors' appointments, religious services, community activities, social visits, and other activities.

46.     In contrast, subway waits are designed to be no more than ten to twenty minutes. A 2017 New York City Comptroller report characterized "normal wait time" for the subway as five minutes. Twenty minutes was a "major delay."[19]

47.     In addition, Access-A-Ride policy explicitly requires customers to wait for at least 30 minutes after their scheduled pickup times before their rides can be considered late.[20] Although the MTA's stated goal in 2022 was for ninety-four percent of its trips to arrive less than thirty

---

[18] *See* DOJ Letter, *supra* note 2, at 4.
[19] *See The Economic Cost of Subway Delays*, N.Y.C. COMPTROLLER, https://comptroller.nyc.gov/reports/the-economic-cost-of-subway-delays/ (last accessed Apr. 24, 2023).
[20] *Taxicab/Car Service Reimbursement Policy*, METRO. TRANSPO. AUTH., https://new.mta.info/accessibility/paratransit/policies-and-forms/taxicab-car-service-reimbursement-policy (last updated Apr. 18, 2023).

1284267 v1

minutes late and eighty-five percent to arrive less than fifteen minutes late, it often does not meet those goals.[21]

48.    Put differently, Paratransit Users are required to wait at least thirty minutes for their rides to arrive on top of the hour-plus wait that the scheduling policy permits.

49.    According to published "Additional Platform Time" data for subways (a measure of the extra time passengers wait above the target ten to twenty minute intervals) averages no more than a couple of minutes.[22]

50.    In contrast, Access-A-Ride delays often last hours. In theory, once Access-A-Ride passengers wait a full thirty minutes, they are permitted to call to request authorization to take a taxi or car service. The procedure requires the rider to wait on hold to speak to a representative, then wait for the representative to cancel their scheduled ride and provide a taxi authorization number that the Paratransit User will use to request reimbursement.[23]

51.    Customers who go through this process, which can be as many as forty-five minutes or more after their original scheduled pickup time, are eligible to receive reimbursement for the costs of their trip via taxi or car service minus the regular $2.75 cost they would have paid for their trip via Access-A-Ride.[24] The reimbursement process takes months.

52.    Further, to use the reimbursement process, the rider must be able to arrange their own taxi or car ride, and able to advance the money to pay for it.

53.    The denial of comparable public transit has real and severe effects on the lives of Paratransit Users. They are unable to count on arriving at work, school, religious services, or

---

[21] METRO. TRANSPO. AUTH.,  NEW YORK CITY TRANSIT KEY PERFORMANCE METRICS 17 (Dec. 2022), https://new.mta.info/document/102836.

[22] METRO. TRANSPO. AUTH.,  NEW YORK CITY TRANSIT KEY PERFORMANCE METRICS 17 (Nov. 2022), https://new.mta.info/document/100341.
[23] *See supra* note 20.
[24] *Id.*

doctors' appointments on time and must factor several more hours of wait, travel, and potential delays into their day. This discrimination limits Paratransit users' ability to fully participate in their communities and creates tremendous anxiety for many of the individuals. It puts their employment, performance in school, and overall health in jeopardy.

54.    Indeed, Paratransit Users may be left waiting on the street for hours in unsafe conditions—extreme cold or hot weather, or late at night in deserted or unfamiliar areas, for example.

55.    Even after they board a ride, Paratransit Users must endure trips that are often geographically senseless. Trips can be far longer than necessary even for efficient multi-passenger service. It is common for Paratransit Users to be taken past or in the opposite direction of their destinations while traveling.[25]

56.    The MTA's discriminatory choice not to provide more comparable service to Paratransit Users means that many disabled people simply give up work opportunities, school, medical care, religious or civic participation, or other aspects of their lives because they cannot reliably, safely, or economically get there on public transit. This is exactly the result the ADA and other disability rights laws were passed to prevent.

**C.  More Comparable Service is Practicable**

57.    The MTA could, practicably, provide comparable service to everyone, but it clings to an outdated and cumbersome scheduling system for disabled people who use Access-A-Ride.

---

[25] *See, e.g.*, Greis Torres et al., *Access-A-Ride or 'Stress-A-Ride?' MTA Service Needs Overhaul, Users Say*, CITY LIMITS (Aug. 21, 2018),  https://citylimits.org/2018/08/21/access-a-ride-or-stress-a-ride-mta-service-needs-overhaul-users-say/; James Barron, *Just Like the Subway, Public Transit for New York's Disabled Riders Is Maddening*, N.Y. TIMES (May 15, 2019), https://www.nytimes.com/2019/05/15/nyregion/mta-access-a-ride-nyc.html; *infra* ¶¶ 89, 110, 143.

58.     In 2016, the Comptroller found that the MTA did not use available GPS technology to monitor Access-A-Ride performance and routing efficiency, relying instead on the self-reporting of the private contractors that provide the service.[26]

59.     Individual trips cost less in the On-demand Pilot Program than in regular Access-A-Ride service. According to two members of the New York City Council, "a single trip under the e-hail program costs the authority $35.91. The same Access-A-Ride trip costs the MTA $68.71."[27]

60.     Moreover, as demonstrated by the examples below, because Access-A-Ride service is often more than thirty minutes late, the MTA sometimes ends up reimbursing customers for taxi fare on top of the cost it paid for the original, late ride.

61.     In November 2017, the MTA launched an "e-hail app pilot, … [to] allow Paratransit customers to electronically hail yellow or green taxicabs on demand, similar to popular on-demand ride services such as Uber, Lyft and others."[28]

62.     The MTA, however, has refused to provide the On-demand Pilot Program service to Paratransit Users beyond the approximately 1200 people in the pilot, which is fewer than 1 in 100 Access-A-Ride users.

63.     Indeed, the MTA has made public statements indicating an intent to curtail the pilot program.[29]

---

[26] N.Y.C. COMPTROLLER, AUDIT REPORT OF THE METROPOLITAN TRANSPORTATION AUTHORITY'S OVERSIGHT OF THE ACCESS-A-RIDE PROGRAM 2 (2016), https://comptroller.nyc.gov/wp-content/uploads/documents/FK15_098A.pdf.

[27] Justin Brannan and Diana Ayala, Opinion, *It's Time to Bring MTA's Paratransit Into the 21st Century*, GOTHAM GAZETTE (Dec. 19, 2019), https://www.gothamgazette.com/130-opinion/9003-time-to-bring-mta-paratransit-into-21st-century-access-a-ride.

[28] *Supra* note 13.

[29] *See, e.g.*, Jeanmarie Evelly, *MTA Moves Forward with Changes to Access-a-Ride Pilot, Despite Protests from Users*, CITYLIMITS (Feb. 27, 2020), https://citylimits.org/2020/02/27/mta-moves-forward-with-changes-to-access-a-ride-pilot-despite-protests-from-users/ ("But sometime this month, the MTA plans to make changes to the on-demand service: While it will double its reach to include 2,400 Access-a-Ride users, it will also limit their number of rides to 16 a month, and cap the per-ride subsidy at $15.").

64.     On information and belief, the MTA has not made on-demand service more widely available solely because it believes that improved service would increase demand.

## Individual Allegations

### Lucy "Luz" Paulino-Santos

65.     Plaintiff Lucy (Luz) Paulino-Santos is a fifty-six-year-old dental office manager who lives in Inwood, Manhattan.

66.     Ms. Paulino-Santos is an Access-A-Ride user and a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and New York City Human Rights Law. She has arachnoiditis, a nerve condition in her spine which makes it difficult for her to walk and stand and causes her severe pain.

67.     She has used Access-A-Ride since 2017 when she first developed arachnoiditis.

68.     Ms. Paulino-Santos uses Access-A-Ride every Monday through Friday to travel to and from work. Additionally, she often uses Access-A-Ride during the week to go to doctors' appointments and on the weekends to go shopping, attend family engagements, and other social events.

69.     In accordance with Access-A-Ride policy, Ms. Paulino-Santos schedules her rides by at least 5 pm of the day before she needs to travel.

70.     She usually schedules her rides via telephone by calling the toll-free Access-A-Ride phone number and speaking to a representative.

71.     Ms. Paulino-Santos usually tries to call to schedule her rides as soon as the scheduling window opens at 7 a.m. and no later than 8 a.m.. She fears not being able to reach a representative to take her call if she does not because of long hold times.

1284267 v1

72.     She has been placed on hold for as long as an hour and has found it extremely difficult to get an Access-A-Ride representative on the phone after 3:30 p.m.

73.     Ms. Paulino-Santos primarily schedules her rides as pickup times instead of as appointment times because appointment times often force her to get picked up too early.

74.     When scheduling a ride with an appointment time, she often tells Access-A-Ride that her appointment is at least fifteen to thirty minutes earlier than it actually is. In this way, Ms. Paulino-Santos can account for the required thirty-minute wait period that Access-A-Ride instructs its customers to anticipate for "traffic or delays" before a ride can officially be considered late or for Access-A-Ride lateness beyond the required thirty-minute wait window.

75.     For example, if Ms. Paulino-Santos gave Access-A-Ride a 7:30 a.m. appointment time to be at work, she would often be given a ride time of 5 a.m.

76.     However, if she schedules her ride as a pickup time instead and asks to be picked up at 6:15 a.m., she makes sure the Access-A-Ride representative scheduling her trip makes a note that she wants to be picked up "no later than" 6:30 a.m.

77.     Otherwise, according to Access-A-Ride policy, she may be required to accept a pickup time that is an hour earlier or later than the time she requested.

78.     Ms. Paulino-Santos chooses to schedule her rides as pickup times rather than as appointment times because she has found that the early ride times she is often given with appointment times—5 a.m. in comparison to 6:30 a.m.—cost her valuable extra hours of sleep.

79.     Ms. Paulino-Santos lives in Inwood, Manhattan, only an approximately thirty-minute drive away from her job in Midtown Manhattan. With Access-A-Ride, she has to be picked up by 6:30 a.m. in order to make it to work by 9 a.m., because she builds an extra two hours into

the pickup times she gives Access-A-Ride in order to budget for the extra time she often spends either waiting for or traveling on Access-A-Ride.

80.     According to the MTA Trip Planner, the same trip on an MTA bus would take between one hour and forty-seven minutes and one hour and fifty-five minutes, including approximately twenty-seven minutes of required walking time. The shortest trip on public transit, according to the MTA Trip Planner, is a subway trip that would take approximately one hour and twenty minutes, including approximately twenty minutes of walking time.

81.     In addition to the time spent scheduling rides or accounting for the scheduled ride times Access-A-Ride gives her, Ms. Paulino-Santos often spends at least forty-five minutes and sometimes up to an hour and a half waiting for her ride to arrive.

82.     For example, there have been several occasions when Ms. Paulino-Santos is still waiting for her scheduled 6:15 a.m. ride at 7:30 a.m.

83.     Ms. Paulino-Santos has often been late for work because of Access-A-Ride. Because she works with patients, she is required to be at work before the first patient arrives. However, she estimates that she was late to work six times during a two-week period in December 2021. In or around April 2023, she was late twice in a two-week time period.

84.     Ms. Paulino-Santos' scheduled evening rides home from work are often late. She estimates that her evening rides are late at least twice a week.

85.     Between September and November 2021, she waited approximately two and a half hours on at least two occasions, including waiting on hold with Access-A-Ride for over an hour, before being picked up.

86.     In accordance with Access-A-Ride policy, when Ms. Paulino-Santos's ride is more than thirty minutes late or does not show up, she sometimes calls Access-A-Ride for a taxi

authorization. With a taxi authorization, Ms. Paulino-Santos takes a cab home and requests reimbursement from Access-A-Ride for the cost of her cab ride, minus the $2.75 she would have paid if she had traveled via Access-A-Ride.

87.    A one-way trip can cost as much as $45. Ms. Paulino-Santos estimates that she has used taxi authorizations at least fifteen times over the course of the last year when Access-A-Ride was late.

88.    Access-A-Ride routing has also adversely affected Ms. Paulino-Santos' rides.

89.    Access-A-Ride often takes Ms. Paulino-Santos in the opposite direction of her destination.

90.    For example, on several occasions, Ms. Paulino-Santos has boarded her Access-A-Ride at her home in Inwood, Manhattan only to be taken into the Bronx in the opposite direction of Midtown Manhattan where she was scheduled to be dropped off. As a result, what would have been a thirty-minute ride on a direct route turns into a two-hour ride.

91.    Ms. Paulino-Santos is being deprived of the benefit of a paratransit system that is comparable, to the extent practicable, to the fixed-route transportation system.

92.    An on-demand paratransit service would greatly improve her experience traveling. She would be able to attend everything from doctors' appointments to social events with more spontaneity and flexibility.

***Betty Vega***

93.    Betty Vega is a seventy-one-year-old retired music industry professional who lives in Brooklyn, New York.

94.     Ms. Vega is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and New York City Human Rights Law. She has severe arthritis, which makes it difficult to stand or walk.

95.     She has been an Access-A-Ride user since 2006 after she had knee surgery for her arthritis.

96.     She uses Access-A-Ride once or twice a week to go to social engagements, attend live music events, and go to doctors' appointments, among other activities.

97.     Between 2006 and 2018, Ms. Vega used the traditional Access-A-Ride service. With the traditional Access-A-Ride service, in accordance with Access-A-Ride policy, Ms. Vega scheduled rides by 5 p.m. of the day before she wanted to travel. She also traveled on traditional Access-A-Ride vehicles.

98.     However, from 2018 until she was removed for an unknown reason in 2019, Ms. Vega participated in an Access-A-Ride program that, in accordance with Access-A-Ride policy, required her to schedule rides by 5pm the day before she wanted to travel, but offered the option of traveling via a yellow or green taxi rather than on a traditional Access-A-Ride vehicle.

99.      Since contacting Access-A-Ride to inquire about her unexpected removal from the program in 2019, Ms. Vega has been assigned broker cars, private car companies that contract with Access-A-Ride, when she calls to schedule a trip. Broker services adhere to Access-A-Ride rules with respect to advanced scheduling, wait times, and the routing of travel.

100.    As a user of the traditional Access-A-Ride service, Ms. Vega usually schedules her rides via telephone by calling the toll-free Access-A-Ride phone number and speaking to a representative.

1284267 v1

101.    Ms. Vega often gives Access-A-Ride an appointment or pickup time that is two hours earlier than the appointment or pickup time she needs to account for the required thirty-minute wait period that Access-A-Ride instructs its customers to anticipate for "traffic or delays" before a ride can officially be considered late or for Access-A-Ride lateness beyond the required thirty-minute wait window.

102.    She usually schedules rides as both appointment times and as pickup times to compare which option gives her a travel time closer to her preference.

103.    For example, for a 10 a.m. appointment time, Access-A-Ride has offered Ms. Vega scheduled ride times as early as 8:20 a.m. For a 10 a.m. pickup time Access-A-Ride has offered Ms. Vega scheduled ride times as late as 11:20 a.m.

104.    She estimates a three-hour one-way trip from her home in Brooklyn to travel destinations in Midtown Manhattan, even though such a trip should only take approximately forty-five minutes by car.

105.    According to the MTA Trip Planner, the same trip on an MTA bus would take approximately fifty-seven minutes, including approximately nineteen minutes of required walking time. The subway trip, also according to the MTA Trip Planner, would take approximately the same time.

106.    Ms. Vega estimates that Access-A-Ride is later than their allowable thirty minutes for approximately eighty percent of her scheduled rides.  As a result, she packs extra snacks and water when she knows she will have to wait for an Access-A-Ride vehicle while away from home.

107.    In accordance with Access-A-Ride policy, when Ms. Vega's ride is more than thirty minutes late or does not show up, she calls Access-A-Ride for a taxi authorization approximately ten to twelve times per month. With a taxi authorization, Ms. Vega pays to take a cab home and

1284267 v1

requests reimbursement from Access-A-Ride for the cost of her cab ride minus the $2.75 she would have paid if she had traveled via Access-A-Ride.

108.    Ms. Vega estimates that she has spent between $2,500 and $3,000 in the last three years on Access-A-Ride taxi authorizations. Reimbursement takes approximately six to eight weeks to arrive.

109.    Access-A-Ride routing has also adversely affected Ms. Vega's rides.

110.    Access-A-Ride often takes Ms. Vega in the opposite direction of her destination. For example, when traveling from her home in Windsor Terrace, Brooklyn to her destination in Manhattan, Ms. Vega is sometimes forced to travel through Queens.

111.    Now that Ms. Vega exclusively receives broker service vehicles, she occasionally receives a call the morning of her ride confirming her trip and the pickup time.

112.    Despite these calls, Ms. Vega's ride often does not arrive at her assigned ride time.

113.    Instead, Ms. Vega regularly calls Access-A-Ride to request the location of her vehicle 15 minutes before her assigned ride time and Access-A-Ride informs her that the vehicle is either going to be late or will not be showing up at all and that the broker company will have to dispatch an alternate vehicle.

114.    Ms. Vega is being deprived of the benefit of a paratransit system that is comparable, to the extent practicable, to the fixed-route transportation system.

115.    An on-demand paratransit service would greatly improve her experience traveling.

116.    She would be able to travel and attend social events with more spontaneity and flexibility.

117.    Instead, Ms. Vega often forgoes travel and activities in order to avoid the hassle of the Access-A-Ride system.

1284267 v1

*Michael Ring*

118.     Plaintiff Michael Ring is fifty-nine years old and lives in Brooklyn, NY.

119.     Mr. Ring is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and New York City Human Rights Law. He has Guillain-Barré syndrome, a neurological condition that causes sudden paralysis.

120.     Mr. Ring has used Access-A-Ride since 2014 when he first developed Guillain-Barré syndrome.

121.     Between 2014 and 2018, Mr. Ring used the traditional Access-A-Ride service, with which he was required to schedule rides forty-eight hours in advance or by 5 p.m. of the day before he wanted to travel. He originally used a wheelchair and could only travel using the traditional Access-A-Ride service and on Access-A-Ride vans. He used Access-A-Ride to travel to approximately eight to ten doctors' appointments per month.

122.     However, since 2018, Mr. Ring has been one of 1200 Access-A-Ride users who participates in the on-demand pilot program, which allows him to request a ride the same day he wants to go somewhere and to travel via a ride-sharing service such as Uber or Lyft that arrives within minutes of his request.

123.     Mr. Ring heard about the pilot program from a friend. He then called Access-A-Ride to ask to be included in it and followed up until Access-A-Ride approved his participation.

124.     When Mr. Ring used the traditional Access-A-Ride service, he scheduled his rides by 5 p.m. of the day before he wanted to travel in accordance with Access-A-Ride policy.

125.     He scheduled his rides via telephone by calling the toll-free Access-A-Ride phone number and speaking to a representative. He also used the Access-A-Ride app to schedule rides.

126.    Mr. Ring found that a one-minute change in his request time could change his scheduled ride time drastically. For example, if he gave Access-A-Ride a 12 p.m. appointment time, Access-A-Ride would give him a 9 a.m. scheduled ride time, but if he gave Access-A-Ride a requested 12:01 p.m. appointment time, Access-A-Ride might give him a scheduled ride time of 10:15 a.m.

127.    The gap between a scheduled ride time based on an appointment time as opposed to a pickup time could be hours.

128.    Mr. Ring usually scheduled his trips as appointment times because without an appointment time, he was often late. He felt Access-A-Ride lacked a sense of urgency when dropping off passengers without an appointment time, and as a result, his ride time was longer.

129.    Mr. Ring often gave  Access-A-Ride an appointment time that was up to an hour earlier than necessary in an attempt to reduce the chances of being late due to the unpredictability of the Access-A-Ride system.

130.    As a result, he would arrive extra early to appointments, turning what should have been a two-hour activity into a six-hour one.

131.    He was either extremely early for his appointments or he was late. There was no in-between or on time.

132.    Mr. Ring estimates that ten to twenty-five percent of his rides were later than Access-A-Ride's required thirty-minute wait window.

133.     As a result, he never scheduled more than one appointment or errand in a day because it would be impossible.

134.    Mr. Ring often had to cancel his rides because his vehicles were late.

135.    In accordance with Access-A-Ride policy, when Mr. Ring's ride was more than thirty minutes late or did not show up, he sometimes called Access-A-Ride for a taxi authorization. With a taxi authorization, he would pay to take a cab home and request reimbursement from Access-A-Ride for the cost of his cab ride, minus the $2.75 he would have paid if he had traveled via Access-A-Ride.

136.    Reimbursement could take anywhere from two to eight weeks. So, Mr. Ring did not use taxi authorizations often.

137.    Access-A-Ride routing also adversely affected Mr. Ring's rides.

138.    Before he was in the pilot program, Access-A-Ride often took Mr. Ring in the opposite direction of his destination to pick up additional passengers. For example, when traveling from his home in Park Slope, Brooklyn to doctors' appointments in Midtown, Manhattan, Mr. Ring was often forced to travel through Queens, turning what should have been an approximately thirty-minute drive into a two-hour trip for Mr. Ring.

139.    According to the MTA Trip Planner, the same trip on an MTA bus would take between one hour and twenty-four minutes and one hour and twenty-nine minutes by bus, including seventeen to twenty-three minutes of walking time. The subway trip, also according to the MTA Trip Planner, would take approximately forty-five to approximately forty-nine minutes, including approximately seventeen to twenty-one minutes of walking.

140.    Access-A-Ride has also picked up Mr. Ring in Brooklyn and brought him to Manhattan before dropping him off in Staten Island.

141.    Mr. Ring would often avoid leisure or social activities because he did not want to have to travel on Access-A-Ride.

142.    Since being accepted into the on-demand pilot program in 2018, Mr. Ring is able to travel much more frequently, and can now take multiple trips per day when needed.

143.    He uses it to go to the gym, to the doctor, and occasionally to run errands.

144.    To schedule a ride, Mr. Ring uses an app that dispatches the requested ride to one of many ride-share services like Uber or Lyft. It usually takes no more than twenty minutes for a driver to accept the trip.

145.    Being a participant in the on-demand pilot program has afforded Mr. Ring much greater flexibility and spontaneity in traveling.

146.    Because the MTA has stated that it may curtail the pilot program, Mr. Ring lives in imminent fear of having to go back to the traditional Access-A-Ride service, which took up so much of his time and energy and seriously limited his travel.

*New York Integrated Network*

147.    NYIN's mission is to build a sustainable integrated network of care for people with intellectual and developmental disabilities, support new and innovative models of care, utilize best practices, and improve quality of life and services for people with disabilities.

148.    NYIN was established in 2012. As of 2022, NYIN is comprised of fourteen member agencies: Access: Supports for Living, Inc., AHRC NYC, Birch Family Services, Inc., Cerebral Palsy Associations of New York State, Inc., HeartShare Human Services of New York, Human Care Services for Families & Children, Inc., Lifespire, Inc., Services for the UnderServed, Inc., the Institutes of Applied Human Dynamics, Inc., United Cerebral Palsy of New York City, Inc. d/b/a ADAPT Community Network, Association for Neurologically Impaired Brain Injured Children, Inc. (ANIBIC), Westchester Jewish Community Services, Inc., Brooklyn Community Services, Jewish Board of Family and Children's Services, Inc.

149.    A central mission of NYIN is to enhance the lives of persons impacted by intellectual and developmental disabilities ("I/DD").

150.    Many of the disabled people who NYIN's member organizations serve ("NYIN Clients") have disabilities that make them unable to consistently use fixed-route transit.  These disabilities include mobility disabilities requiring use of a wheelchair or other assistive devices, cognitive disabilities that make it difficult, impossible, or unsafe to navigate the fixed-route system, and behavioral and mental health disabilities, such as severe anxiety, sensory impairments, or difficulty with crowds, that prevent riding on fixed-route transit.

151.    NYIN's member agencies reach over 20,000 people with I/DD and have over ten thousand employees directly supporting people with intellectual and developmental disabilities.

152.    Many of NYIN's member agencies include people with I/DD on their board of directors or advisory board, and on their advocacy committee/councils, and most include representatives of people with I/DD, such as family members.

153.    As one example of NYIN's work, it created Meaningful New York, a nonprofit dedicated to self-direction for people with intellectual and developmental disabilities, to give people and their families more control over the services they receive, including supporting their work, travel, and other independence.

154.    NYIN's mandate also includes promotion of effective government policies that take the needs of people with intellectual and developmental disabilities into account in designing social services policies. As part of this work, it has devoted resources to opposing the unlawful discrimination described in this complaint.

155.    NYIN's members are impaired in their ability to render their services to their clients and have to divert resources because of the Next Day Rules, wait times, and routing/trip length.

156.    Clients, employees, and board members of NYIN member agencies frequently experience problems with Access-A-Ride like those described in this complaint. They often experience excessively long routes, spending many hours to travel between two points that are a few miles apart; long waits to be picked up or dropped off; rides that simply never arrive, and other issues as described in this Complaint.

157.    For example, because of their disabilities some clients need to be accompanied by staff of the NYIN member agencies when they travel. Trips that should only take a few hours take all day. Agencies must limit the trips they help the clients take, impacting their clients' inclusion and engagement in their communities.

158.    In addition, staff at NYIN member agencies assist clients in calling Access-A-Ride; they have to spend hours on the phone, for example to schedule rides, or to inquire about rides that are late or don't show up. This is time that NYIN member agencies' staff could otherwise be devoting to their core work – providing community-based care and support to children and adults with I/DD.

159.    In addition, some NYIN member agencies have had to pay staff overtime because of the Access-A-Ride problems. On occasion, they have paid for a private car service when Access-A-Ride did not arrive.

160.    For example, the Access-A-Ride problems wreak havoc with medical appointments for NYIN agency clients. Agencies may be forced to avoid scheduling care because they lack the resources required—devoting an entire day, and maybe overtime, of staff time to transportation to an appointment. Access to healthcare is a fundamental right and need for this vulnerable population. It should not be compromised simply because of transportation challenges.

161.    Indeed, on occasion, NYIN clients are forced to leave without seeing a medical provider at all, because providers' schedules are delayed and Access-A-Ride scheduling is inflexible.

162.    Thus, as a direct result of Access-A-Ride's shortcomings, NYIN agency clients sometimes do not receive the health care they need.

163.    NYIN member agencies also hold activities for disabled clients, such as educational outreach and workforce development programs. The agencies are sometimes unable to provide these opportunities because disabled people who rely on Access-A-Ride cannot get there. In addition, their staff or volunteers may have to spend more time on a program because people will have to arrive early and stay late.

164.    NYIN clients who rely on Access-A-Ride experience substantially more difficulty going about their daily lives than they would if the service were comparable to fixed-route transit. This hinders NYIN from achieving its core goal of values-based collaboration with these clients.

**Class Action Allegations**

165.    Pursuant to Federal Rule of Civil Procedure 23(b)(2), the named plaintiffs bring this action for injunctive and declaratory relief on their own behalf, and on behalf of all persons similarly situated.

166.    The class that plaintiffs seek to represent is composed of all Paratransit Users, that is, people who cannot consistently use fixed-route transit because of a disability, and who use Access-A-Ride or would use Access-A-Ride if it had response and travel times more comparable to the MTA's fixed-route transit.

167.    The class claims are solely for injunctive and declaratory relief; no damages are sought.

1284267 v1

168.    The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and the Court. According to MTA data,  as of November 1, 2022, there were more than 173,000 registrants for Access-A-Ride. Between November 2021 and November 2022, riders took hundreds of thousands of trips per month, totaling more than 6,500,000 rides in the twelve-month period.[30]

169.    There is a well-defined community of interest in central questions of law and fact for everyone subjected to discrimination by the MTA in its Access-A-Ride policies and procedures, including but not limited to the Next Day Rule and the Response Time Policy, as well as the Routing.

170.    Common questions of law and fact predominate, including, but not limited to

   a.   Whether the Next Day rules, Wait Time rules, and routing violate disability discrimination laws;

   b.   Whether it is practicable to provide Access-A-Ride service that is more comparable to the bus and subway service provided to nondisabled riders.

171.    The named plaintiffs are adequate class representatives because they are directly impacted by the MTA's consistent failures to provide comparable service. Their interests are not antagonistic to, or in conflict with, the interests of the class.

172.    The attorneys representing the class are highly trained, duly qualified, and experienced in representing plaintiffs in civil rights class actions.

173.    The named plaintiffs' claims are typical of the claims of the class because the named plaintiffs are similarly affected by the violations.

---

[30] *Supra* note 16.

1284267 v1

174.    The MTA has acted and/or failed to act on grounds generally applicable to the class as a whole, making final declaratory and injunctive relief appropriate with respect to the class as a whole.

## FIRST CAUSE OF ACTION

### Violation of the Americans with Disabilities Act

175.    Plaintiffs and the class re-allege and incorporate herein all previously alleged paragraphs of this complaint.

176.    Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in or otherwise benefiting from its programs, or otherwise discriminating against a person on the basis of disability: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

177.    Defendants' public transit services are a "program or activity" within the meaning of the ADA.

178.    The law specifies that it is unlawful discrimination not to provide paratransit service that is "comparable, to the extent practicable" to fixed-route service. 42 U.S.C. § 12143(a).

179.    Defendants, through the policies and practices described above, have failed to provide paratransit service that is comparable to the extent practicable to fixed-route service.

180.    The violation is willful for the reasons described above.

181.    Named plaintiffs and the proposed class of Paratransit users are, and will continue to be, harmed by defendants' discrimination as described above.

1284267 v1

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973

182.   Plaintiff and the class re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

183.   Section 504 of the Rehabilitation Act of 1973 provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

184.   Prohibited disability discrimination under Section 504 includes failure to take affirmative steps required to provide access to a governmental program or activity to people with disabilities. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 275 (2d Cir. 2003).

185.   Defendants' public transit services, including Access-A-Ride, are a "program or activity" within the meaning of the Rehabilitation Act. 29 U.S.C. § 794(b)(1)(A); *see* 49 C.F.R. § 27.7(a) (U.S. Department of Transportation implementing regulations).

186.   Defendants, through the policies and practices described above, have failed to provide meaningful access to public transportation service for named plaintiffs and class members.

187.   The violation is willful for the reasons described above.

188.   Named plaintiffs and the proposed class of Paratransit Users are, and will continue to be, harmed by defendants' discrimination as described above.

## THIRD CAUSE OF ACTION

### Violation of the New York City Human Rights Law

189.   Plaintiff and the class re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

190.    The New York City Human Rights Law (NYCHRL), § 8-107(4), makes it "an unlawful discriminatory practice" for a provider of a public accommodation to deny "full and equal enjoyment, on equal terms and conditions" of its services "[b]ecause of … disability."

191.    It is similarly unlawful "not to provide a reasonable accommodation to enable a person with a disability to … enjoy the right in question provided that the disability is known or should have been known." *Id.* § 8-107(15)(a).

192.    Reasonable accommodation means anything that does not cause undue hardship; it is the defendant's burden to establish undue hardship. *Id.* § 8-102.

193.    The NYCHRL further defines as unlawful discrimination "a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter." N.Y.C. Admin. Code § 8-107(17).

194.    Defendants' public transit services are public accommodations within the meaning of the NYCHRL.

195.    Defendants, through the policies and practices described above, have failed to provide meaningful access to public transportation service for named plaintiffs and class members.

196.    The violation is willful for the reasons described above.

197.    Named plaintiffs and the proposed class of Paratransit users are, and will continue to be, harmed by defendants' discrimination as described above.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on their own behalf, and on behalf of the class, pray for the following relief against defendants:

a.  That this matter be certified as a class action as set forth above, that plaintiffs be appointed class representatives, and their attorneys be appointed class counsel;

b.  That defendants be enjoined from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the New York City Human Rights Law;

c.  That defendants be ordered to adopt policies and procedures sufficient to remedy the violations complained of herein;

d.  For an Order finding and declaring that defendants' acts, omissions, policies, and practices as challenged herein are unlawful;

e.  For an award of reasonable attorneys' fees and costs; and

f.  For such other relief that the Court deems just and proper.

DATED:      New York, NY
            April 26, 2023

VLADECK, RASKIN & CLARK P.C.

Maia Goodell
Emily Bass
565 Fifth Avenue, 9th Floor
New York, NY 10017
(212) 403-7300 (main)
(212) 221-3172 (fax)
mgoodell@vladeck.com
ebass@vladeck.com

NEW YORK LAW SCHOOL LEGAL
SERVICES, INC.

Britney R. Wilson
185 W. Broadway
New York, NY 10013
(212) 431-2182
britney.wilson@nyls.edu

1284267 v1