UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUZ PAULINO-SANTOS, MICHAEL RING,
BETTY VEGA and NEW YORK
INTEGRATED NETWORK,

                              Plaintiffs,

                -against-

METROPOLITAN TRANSIT AUTHORITY,
NEW YORK CITY TRANSIT, JOHN
LIEBER and RICHARD DAVEY,

                              Defendants.

23-CV-3471 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs Luz Paulino-Santos, Michael Ring, Betty Vega and New York Integrated

Network ("NYIN," together with the foregoing, "Plaintiffs") bring this putative class action

against the Metropolitan Transit Authority (the "MTA"), the New York City Transit Authority

(the "NYCTA"), John Lieber, in his official capacity as Chair and Chief Executive Officer of the

MTA, and Richard Davey, in his official capacity as President of NYCTA (collectively,

"Defendants"), asserting claims under Title II of the Americans with Disabilities Act ("ADA"),

Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act") and Section 8–107 of

the New York City Human Rights Law ("NYCHRL"). ECF No. 1 ("Complaint" or "Compl.")

¶¶ 22–30, 175–197. Plaintiffs seek declaratory and injunctive relief with respect to the MTA's

paratransit system Access-A-Ride ("AAR"), which provides service to approximately 173,000

registered users. *Id*. ¶¶ 8, 34, 165.

The ADA requires public transit operators to provide individuals with disabilities "a level

of service (1) which is comparable to the level of designated public transportation services

provided to individuals without disabilities using such system; or (2) in the case of response

time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system." 42 U.S.C. § 12143(a). Plaintiffs claim that AAR does not provide access to public transit for individuals with disabilities that is "comparable" to the services the MTA provides to individuals without disabilities through its fixed route transit like subways and buses. Compl. ¶¶ 1–2. Pending before the Court is Defendants' motion to dismiss the complaint for failure to state a claim and, with respect to Plaintiff Ring, for lack of standing. ECF No. 34. For the reasons stated herein, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

### A. Definitions

A "fixed route system" is defined by the ADA as "a system of providing designated public transportation on which a vehicle is operated along a prescribed route according to a fixed schedule." 42 U.S.C. § 12141(3). "Paratransit" is defined by the ADA's implementing regulations as "comparable transportation service required by the ADA for individuals with disabilities who are unable to use fixed route transportation systems." 49 C.F.R. § 37.3. This case concerns whether AAR is, in fact, a "comparable" service. The Court thus uses the term "paratransit" generally to refer to transportation service for individuals with disabilities who are unable to use fixed route transportation systems, without assuming that such service is necessarily "comparable." *See Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 112 (2d Cir. 2011) ("Paratransit services are public transportation services for disabled users.").

### B.  The Parties

The facts are set forth below as alleged in the Complaint and the materials incorporated therein.[1] Defendant MTA, a public benefit corporation chartered by the New York State Legislature, operates the largest transportation network in North America. Compl. ¶¶ 26–27. NYCTA is a subsidiary of the MTA and both NYCTA and the MTA receive federal funding to operate their transportation services. *Id*. ¶¶ 29, 31.

In June 2022, the MTA announced that it entered into a settlement of two lawsuits whereby it committed, over the next 30 years, to provide stair-free access to most New York City subway stations. *Id*. ¶ 4, n.1. Nonetheless, the current subway system remains largely inaccessible to many people with disabilities. *Id*. Approximately 173,000 people, including Plaintiffs Paulino-Santos, Ring and Vega (collectively, the "Individual Plaintiffs"), are registered for AAR, which provides paratransit services to people not able to take fixed route service (subway, bus or train) throughout all five New York City boroughs. *Id*. ¶¶ 22–24, 32, 34. Between November 2021 and November 2022, AAR provided approximately 6,500,000 rides. *Id*. ¶ 34. Individual Plaintiffs, and many of the members served by Plaintiff NYIN, are unable to use subways and buses consistently because of their disabilities. *Id*. ¶ 6.

### C.  The AAR System and the Policies and Practices of AAR Challenged by Plaintiffs

To use the AAR system, paratransit users can request a ride based on pickup time or appointment time. *Id*. ¶ 41. If a paratransit user requests a pickup time, AAR provides the user

---

[1] "[A] court is generally confined to the facts alleged in the complaint for the purposes of considering a motion to dismiss pursuant to 12(b)(6). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit." *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 254 (S.D.N.Y. 2018) (internal citations omitted).

with a computer-generated "scheduled pickup time" at which time the requested vehicle should arrive at the user's pickup location. *Id*. ¶ 42. The scheduled pickup time may be up to an hour earlier or later than requested. *Id*. ¶ 43. However, according to the allegations in the Complaint, AAR delays often last hours. *Id*. ¶ 50. Once a passenger waits 30 minutes after the scheduled pickup time, they may call AAR to request authorization to take a taxi or car service that will be reimbursed. *Id*. The procedure provides that the passenger speaks to an MTA representative, who will cancel the scheduled ride and provide a taxi authorization number that the paratransit user will use to request reimbursement. *Id*. To use the reimbursement process, the rider must arrange their own taxi or car ride and advance the money to pay for it. *Id*. ¶ 52. By contrast, New York City's basic guidelines for the subway provide for wait times of ten minutes during peak hours, twelve minutes during non-peak hours and twenty minutes during overnight hours or during "major delay[s]." *Id*. ¶¶ 12, 46.

Plaintiffs challenge the legality of four policies and practices of AAR (collectively, the "Challenged Policies"). *Id*. ¶ 11. First, AAR requires users to reserve trips "by 5 p.m. the day before you wish to travel" and cancel reservations two hours in advance or face penalties (the "Next-Day Policies"). *Id*. Second, AAR requires users to accept a pickup time "up to an hour earlier or later than the time requested" (the "One-Hour Policy"). *Id*. Third, AAR users must wait an additional 30 minutes beyond the scheduled pickup time determined by the One-Hour Policy before the ride is considered late enough for a taxi authorization (the "30-Minute Policy"). *Id*. And fourth, Plaintiffs allege that AAR suffers from a variety of capacity constraints that negatively impact its users (the "Capacity Constraints"). *Id*. ¶¶ 11, 17, 50–56. These Capacity Constraints include untimely pickups and drop-offs as well as trips of excessive length. *Id*. ¶¶ 11, 50–51, 54–55.

4

According to Plaintiffs, the Challenged Policies risk leaving individuals with disabilities waiting on the street for hours in unsafe conditions. *Id.* ¶ 54. They also create trips that are excessively long and geographically senseless, including often going past or in the opposite direction from the rider's destination. *Id.* ¶ 55. As a result of the limitations created by these policies, many eligible paratransit users, including Individual Plaintiffs, have to give up errands, work meetings, social engagements, worship, civic participation, medical visits or other trips. *Id.* ¶¶ 17, 53, 117. Paratransit users are unable to count on arriving at work, school, religious services or doctors' appointments on time and must factor into their day several more hours of wait, travel and potential delays. *Id.* ¶¶ 53, 56. They are also unable to accommodate spontaneous trips, gatherings or changes of plans that are characteristic of daily life. *Id.* ¶ 38.

### D.  The E-Hail Pilot Program

In November 2017, the MTA launched an "e-hail app pilot, … [to] allow Paratransit customers to electronically hail yellow or green taxicabs on demand, similar to popular on-demand ride services such as Uber, Lyft and others." *Id.* ¶ 61. Approximately 1,200 AAR users were included in the E-Hail Pilot Program (the "Pilot Program"), including Plaintiff Ring (since 2018). *Id.* ¶¶ 62, 122. Plaintiffs allege that individual trips that are part of the Pilot Program cost the MTA less than regular AAR rides. *Id.* ¶ 59. According to the Complaint, the MTA has previously threatened to end or limit on-demand access. *Id.* ¶¶ 16, 63. In June 2023, after this litigation was filed, the MTA issued a press release announcing it was expanding the Pilot Program to an additional 2,400 riders, from February to August of 2024, subject to possible extension, and implementing new rules capping the number of monthly rides per user and increasing the customer co-pay. *See MTA Launches E-Hail Expansion Tripling Number of Pilot Participants to 3,600 Access-A-Ride Customers*, MTA (June 27, 2023)

https://new.mta.info/press-release/mta-launches-e-hail-expansion-tripling-number-of-pilot-participants-3600-access-ride (the "MTA Press Release");[2] ECF No. 35 ("Mot.") at 21–24 n.11–13.

### E.  Plaintiffs' Experiences

#### 1.  Plaintiff Paulino-Santos

Plaintiff Paulino-Santos has used AAR since 2017. Compl. ¶ 67. She tries to call to schedule her AAR rides as soon as the scheduling window opens at 7 a.m. and no later than 8 a.m. due to long hold times; she has found it extremely difficult to get an AAR representative on the phone after 3:30 p.m. *Id*. ¶¶ 71–72. Due to long AAR wait and travel times, Ms. Paulino-Santos has to be picked up by 6:30 a.m. from her residence in Inwood, Manhattan in order to make it to work in midtown Manhattan by 9 a.m. *Id*. ¶ 79. According to the MTA Trip Planner, the same trip on an MTA bus would take between 1 hour and 47 minutes and 1 hour and 55 minutes, including approximately 27 minutes of required walking time. *Id*. ¶ 80. The shortest trip on public transit, according to the MTA Trip Planner, is a subway trip that would take approximately 1 hour and 20 minutes, including approximately 20 minutes of walking time. *Id*. Ms. Paulino-Santos often spends 45 to 90 minutes beyond the scheduled pickup time waiting for her AAR ride to arrive and has suffered from waits as long as two and a half hours, including waiting on hold for over an hour on the phone, before being picked up *Id*. ¶¶ 81–82, 85. On several occasions, Ms. Paulino-Santos has boarded an AAR ride at her home in Inwood,

---

[2] The Court may take judicial notice of facts that are "publicly announced on a party's website," the authenticity of which "is not in dispute and . . . is capable of accurate and ready determination." *Volpe v. Am. Sign Language Commc'n Ctr., Inc.*, 200 F. Supp. 3d 428, 431–32 (S.D.N.Y. 2016) (internal citation omitted).

Manhattan only to be first taken into the Bronx, in the opposite direction of her destination, turning her commute into a two-hour ride. *Id.* ¶ 90.

As a dental office manager, Ms. Paulino-Santos is required to be at work before the first patient arrives, but she is often late for work due to AAR. *Id.* ¶¶ 65, 83. She estimates that evening rides home from work are also late at least twice per week. *Id.* ¶ 84. When Ms. Paulino-Santos's ride is more than 30 minutes late or does not show up, she sometimes calls AAR for a taxi authorization – which she has used at least 15 times within a one-year period – costing her up to $45 up front per ride. *Id.* ¶¶ 86–87.

### 2.  Plaintiff Vega

Plaintiff Vega, who has used AAR since 2006, has experienced similar delays to Ms. Paulino-Santos. *Id.* ¶¶ 95, 106. For a 10 a.m. requested pickup time, AAR has offered Ms. Vega scheduled ride times as late as 11:20 a.m. *Id.* ¶ 103. Ms. Vega allots three hours for a one-way trip on AAR from her home in Windsor Terrace, Brooklyn to midtown Manhattan. *Id.* ¶ 104. According to the MTA Trip Planner, the same trip on an MTA bus or the subway would take approximately 57 minutes, including approximately nineteen minutes of required walking time. *Id.* ¶ 105. Ms. Vega estimates that AAR is more than 30 minutes late for approximately 80% of her scheduled rides, and sometimes the rides do not show up at all; consequently, she calls AAR for taxi authorizations approximately 10 to 12 times per month, costing her $2,500 to $3,000 up front over three years. *Id.* ¶¶ 106–108, 113. Reimbursement takes approximately six to eight weeks to arrive. *Id.* ¶ 108. When the rides do arrive, AAR often takes Ms. Vega in the opposite direction of her destination, for instance, taking her to Queens on a trip from Windsor Terrace, Brooklyn to midtown Manhattan. *Id.* ¶ 110.

### 3. Plaintiff Ring

Between 2014 and 2018, Plaintiff Ring used the traditional AAR service, but since 2018 has been part of the Pilot Program. *Id*. ¶ 121–22. When using the traditional AAR service, Mr. Ring typically found that if he scheduled rides as appointment times he was often extremely early (by hours) for appointments and that if he scheduled rides as pickup times that he was often late. *Id*. ¶¶ 127–131. Mr. Ring estimates that 10% to 25% of his rides were more than 30 minutes late. *Id*. ¶ 132. As a result of these issues, he was unable to schedule more than one appointment or errand in a day and would often avoid leisure or social activities because he did not want to have to travel on AAR. *Id*. ¶¶ 133, 141. Mr. Ring sometimes used taxi authorizations, for which it took two to eight weeks for him to be reimbursed. *Id*. ¶¶ 135–36. Before he was in the Pilot Program, AAR rides often took Mr. Ring in the opposite direction of his destination to pick up additional passengers, including taking him through Queens on trips from Park Slope, Brooklyn to doctors' appointments in midtown Manhattan, which took 2 hours on AAR. *Id*. ¶ 138. According to the MTA Trip Planner, the same trip on an MTA bus would take between 1 hour and 24 minutes and 1 hour and 29 minutes, including 17 to 23 minutes of walking time. *Id*. ¶ 139. The subway trip, also according to the MTA Trip Planner, would take approximately 45 to 49 minutes. *Id*.

Since being accepted into the Pilot Program, Mr. Ring is able to travel much more frequently and can now take multiple trips per day when needed, affording him greater flexibility and spontaneity. *Id*. ¶¶ 142, 145. To schedule a ride, Mr. Ring uses an application that dispatches the requested ride to one of many ride-share services like Uber or Lyft; it usually takes no more than twenty minutes for a driver to accept the trip. *Id*. ¶ 144. Mr. Ring is afraid the MTA may curtail the Pilot Program. *Id*. ¶ 146.

### 4.  Plaintiff NYIN

Plaintiff NYIN is a nonprofit coalition of more than a dozen agencies providing care for individuals with disabilities; many NYIN clients have disabilities that make them unable to consistently use fixed route transit. *Id*. ¶¶ 25, 147, 150. Plaintiffs allege that clients, employees and board members of NYIN member agencies frequently experience problems with AAR such as very long route times, including for travel between two points that are only a few miles apart. *Id*. ¶ 156. NYIN member agencies assist clients with disabilities by spending hours on the phone scheduling rides or inquiring about late or no-show rides or by accompanying clients on their rides, which can take the entire day due to delays and long trip lengths. *Id*. ¶¶ 157–58. Due to these issues, NYIN member agencies' staff divert resources away from their core work to deal with AAR issues. *Id*. ¶ 158. Moreover, according to Plaintiffs, AAR problems interfere with medical appointments (as well as educational and workforce development programs) for NYIN agency clients, sometimes forcing member agencies to forgo scheduling care because they lack the resources to devote an entire day of staff time (including overtime) for transportation to an appointment. *Id*. ¶¶ 160, 163. NYIN clients sometimes forgo medical care altogether because care providers' schedules are delayed, and AAR scheduling is inflexible. *Id*. ¶ 161.

### F.  USAO Investigation into AAR

On October 17, 2022, the U.S. Attorney's Office for the Southern District of New York ("USAO") issued a letter detailing findings of its investigation of the AAR program. *Id*. ¶ 10; *USAO Investigation of the New York City Transit Authority's Access-A-Ride Program Under Title II of the Americans with Disabilities Act*, U.S. Dep't of Just. (Oct. 17, 2022) (last accessed Mar. 28, 2024), https://www.justice.gov/crt/case/new-york-city-transit-authoritys-access-ride-program (the "USAO Letter"). Relying on data provided by NYCTA, the USAO found that "AAR's

paratransit service fails to provide service that is 'comparable to the level of designated public transportation services provided to individuals without disabilities using such system.'" USAO Letter at 1–2 (quoting 42 U.S.C. § 12143(a)). In other words, the MTA's paratransit system did not provide a level of service comparable to its fixed transit services. *Id*. at 3. Specifically, the USAO found that AAR suffered from a pattern or practice of significant untimely drop-offs (including late drop-offs and "a concerning number of very early drop-offs") as well as excessive travel times that "significantly limit the availability of service to ADA paratransit eligible persons." *Id*. at 2, 4 (quoting 49 C.F.R. § 37.131(f)(3)). For example, the USAO found that paratransit travel times were excessive when compared to similar trips using the fixed route system for 78% of trips originating in Brooklyn, 91% of trips originating in Manhattan and 72% of trips originating in Queens. *Id*. at 5. The USAO concluded that the foregoing patterns or practices constitute "capacity constraints" that unlawfully limit the availability of service to ADA paratransit eligible individuals. *Id*. at 2–6.

### G. Procedural History

On April 26, 2023, Plaintiffs instituted this putative class action suit. *See* Compl. Plaintiffs allege that Defendants are in violation of the ADA, Rehabilitation Act and NYCHRL. *Id*. ¶¶ 175–197. Plaintiffs seek to represent a class of individuals who cannot consistently use fixed route transit because of a disability, including the approximately 173,000 individuals registered for AAR. ¶¶ 8, 34, 166, 168. Plaintiffs seek injunctive and declaratory relief enjoining Defendants from violating the ADA, Rehabilitation Act and NYCHRL, declaring the Challenged Policies to be unlawful and ordering Defendants to remedy the violations in the Complaint; Plaintiffs do not seek damages. *Id*. ¶¶ 8, 34, 165, 167. On August 24, 2023, Defendants filed the instant motion to dismiss. ECF No. 34.

## LEGAL STANDARDS

The Court sets forth the legal standards governing motions to dismiss for failure to state a claim and lack of standing.

## I.    Motion to Dismiss for Failure to State a Claim

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

## II.    Motion to Dismiss for Lack of Standing

"In reviewing a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(1), the court 'must accept as true all material factual allegations in the complaint, but is not to draw inferences from the complaint favorable to plaintiffs.'" *Cruz v. N.Y.C. Dep't of Educ.*, No. 19-CV-856 (PGG), 2020 WL 1322511, at *6 (S.D.N.Y. Mar. 20, 2020) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)). "Lack of standing may be grounds for dismissal

under Rule 12(b)(1)." *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 254 (S.D.N.Y. 2018). "To survive the motion to dismiss, the pleadings must only allege facts that affirmatively and plausibly suggest that Plaintiffs have standing to sue." *Id*. at 255 (internal citations omitted). "When a claim arises from a civil rights statute, such as the ADA, courts must exercise special care in conducting a standing analysis. The Supreme Court has instructed courts to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, complaints by private persons are the primary method of obtaining compliance with the Act." *Id*. (internal citation and quotation marks omitted).

## DISCUSSION

The Court sets forth the statutory and regulatory framework governing Plaintiffs' ADA claims. Next, the Court determines that it must apply the ADA's implementing regulations to the Challenged Policies, which forecloses Plaintiffs' challenges to AAR's Next-Day and One-Hour Policies under the ADA. In all other respects, Plaintiffs' ADA claims may proceed. Following form, such claims also suffice to state claims under the Rehabilitation Act and the NYCHRL. Moreover, Plaintiffs' challenges to the Next-Day Policies and the One-Hour Policy are not preempted and make out a plausible violation of the NYCHRL, which demands more than the floor set by the ADA. Finally, the Court finds that Plaintiff Ring lacks standing because he does not establish any present or certainly impending injury stemming from AAR, the program which this lawsuit challenges.

## I.     Plaintiffs' ADA Claim Largely Survives Defendants' Motion to Dismiss

The Court sets forth the statutory and regulatory frameworks governing Plaintiffs' ADA claims, and then applies the foregoing to the Challenged Policies.

### A. ADA Statutory Framework

The MTA and NYCTA receive federal funding and are public entities subject to the requirements of the ADA. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 207 (2d Cir. 2003); *Johnson v. MTA-New York City Transit*, No. 19-CV-3345 (VEC) (RWL), 2020 WL 6530915, at *5 (S.D.N.Y. Feb. 6, 2020), *report and recommendation adopted*, No. 19-CR-3345 (VEC), 2020 WL 5037799 (S.D.N.Y. Aug. 26, 2020); Compl. ¶¶ 29, 31.

Congress passed the ADA to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 115 (2d Cir. 2011) (quoting 42 U.S.C. § 12101(b)(1)). "Title II of the ADA covers discrimination in the provision of public services and is divided into Parts A and B." *Id*. Part A governs public services generally, and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. (quoting 42 U.S.C. § 12132). "A public entity discriminates against an . . . individual with a disability when it fails to provide meaningful access to its benefits, programs, or services." *Brooklyn Ctr. for Independence of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021) (cleaned up). "To ensure 'meaningful access' a public entity must make 'reasonable accommodations in its program or benefit." *Id*. (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). "To determine whether a public entity has failed to make reasonable accommodation, [courts] assess whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled." *Id*. at 62 (cleaned up).

Part B of Title II specifically governs the provision of public transportation services. *Id.*; *see also Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 207 (2d Cir. 2003) (citing 42 U.S.C. § 12143(a)) ("The [ADA] expressly bars such discrimination in public transportation."). Section 12143, the provision governing paratransit services, requires public entities operating fixed route transportation systems to provide individuals with disabilities with paratransit services that are "comparable to the level of designated public transportation services provided to individuals without disabilities." *Id.* (quoting 42 U.S.C. § 12143(a)). Failure to provide such comparable services "shall be considered discrimination" for purposes of section 12132. *Id.* (quoting same).

The text of the ADA itself offers little guidance on what "comparable" service means. *See id.* 208–09. Legislative history provides:

> The term "comparable level of services" means that when all aspects of a transportation system are analyzed, equal opportunities to use the transportation system exist for all persons—individuals with and without disabilities. The essential test to meet is whether the system is providing a level of service that meets the needs of persons with and without disabilities to a comparable extent. For instance, if a person with a disability calls for a ride on a demand response system for the general public—and an accessible bus arrives within fifteen minutes—that is equal treatment if a person without a disability has to wait for the bus for an equivalent amount of time. However, if the bus arrives and it does not have a lift and one is needed, or if a disabled person has to wait considerably more time than a non-disabled person, then equal opportunity to use the demand responsive public transportation system is not being provided.

H.R. REP. NO. 101-485, at 92–93 (1990). To provide greater clarity and specificity on its paratransit requirements, the ADA contemplated that "the regulations issued under this section shall establish minimum service criteria for determining the level of services to be required under this section." 42 U.S.C. § 12143(c)(3).

### B.  ADA Regulatory Framework

"The Secretary of Transportation has the exclusive authority to issue final regulations implementing Part B" of Title II of the ADA. *Abrahams*, 644 F.3d at 115. Pursuant to that authority, the Department of Transportation (the "DOT") promulgated regulations governing the provision of paratransit services. *Id.* at 116; *see also Anderson*, 337 F.3d at 207; 49 C.F.R. § 37.121 *et seq.* (the "Paratransit Regulations"). The Paratransit Regulations provide that "[t]o be deemed comparable to fixed route service, a complementary paratransit system shall meet the requirements of §§ 37.123–37.133 of this subpart." 49 C.F.R. § 37.121(b).

Section 37.131 sets forth the service criteria contemplated by the ADA. With respect to "response time," which the ADA requires to be "comparable, to the extent practicable"[3] to service provided to individuals without disabilities, Section 37.131 provides, *inter alia*, that a public transit entity:

1. "shall schedule and provide paratransit service to any ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day" (the "Next-Day Rule");

2. "may negotiate pickup times with the individual, but the entity shall not require an ADA paratransit eligible individual to schedule a trip to begin more than one hour before or after the individual's desired departure time" (the "One-Hour Rule"); and

3. "may use real-time scheduling in providing complementary paratransit service."

*Id.*

Section 37.131 requires that the fare for a paratransit trip "shall not exceed twice the fare that would be charged to an individual paying full fare . . . on the entity's fixed route system." (the "Fare Price Rule"). *Id.* § 37.131(c). Finally, Section 37.131 forbids capacity constraints in the form of "any operational pattern or practice that significantly limits the availability of service

---

[3] *See* 42 U.S.C. § 12143(a).

to ADA paratransit eligible persons," including "(A) [s]ubstantial numbers of significantly untimely pickups for initial or return trips; (B) [s]ubstantial numbers of trip denials or missed trips; [and] (C) [s]ubstantial numbers of trips with excessive trip lengths." *Id.* § 37.131(f).[4]

The Paratransit Regulations are given "controlling weight" unless they are "arbitrary, capricious, or manifestly contrary to the statute." *McNamee v. Dep't of Treasury*, 488 F.3d 100, 105 (2d Cir. 2007) (quoting *Chevron, U.S.A, Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984)). Plaintiffs rely on the DOT's regulations in the Complaint, *see* Compl. ¶¶ 7, 185, and make no *Chevron* deference argument or otherwise provide a basis to find that the Paratransit Regulations are arbitrary, capricious or manifestly contrary to the ADA. Accordingly, the Paratransit Regulations control here in expounding the ADA's mandate of "comparable" paratransit service.

### C. The Next-Day and One-Hour Policies Do Not Violate the ADA

Two policies that Plaintiffs challenge – the Next-Day and One-Hour Policies – are taken directly from the Paratransit Regulations. *See* Mot. at 1; ECF No. 50 ("Rep.") at 4; 49 C.F.R. § 37.121(b). Defendants argue that because the regulations specifically endorse these policies, Plaintiffs cannot make out a claim under the ADA in this regard. Mot. at 1. Plaintiffs, on the other hand, argue that the criteria established by the Paratransit Regulations state only what is necessary, not sufficient, for a transit provider to provide "comparable" service to individuals with disabilities as mandated by the ADA. Opp. at 5–6. The Court ultimately agrees with Defendants that the regulations foreclose Plaintiffs' challenges to these policies under the ADA.

---

[4] This is not an exhaustive list. *See* 49 C.F.R. § 37 App. D ("Though these three examples probably cover the most frequently cited problems in paratransit operations that directly or indirectly limit the provision of service that is theoretically available to eligible persons, the list is not exhaustive."); Americans With Disabilities Act (ADA): Guidance, 2015 WL 6037995 at *174 (the "FTA Circular") ("Other capacity constraints [include] untimely drop-offs, poor telephone performance, and general practices that can discourage use of complementary paratransit . . . .").

However, the Court questions whether the AAR system with its Next-Day and One-Hour Policies is indeed "comparable" to the fixed transit system.

From the perspective of paratransit users, it is not difficult to see why the MTA's Next-Day Policies and One-Hour Policies result in paratransit service that does not appear comparable to the service provided to individuals without disabilities. *See Transportation for Individuals With Disabilities*, 56 Fed. Reg. 45584, 45607 (Sept. 6, 1991) (the appropriate lens to assess "comparability" for purposes of Section 12143 is "the point of view of the consumer, not the provider.").[5] After all, users of the MTA's fixed route service can make same-day travel plans without needing to schedule in advance, which affords much greater flexibility, spontaneity and ability respond to the vicissitudes of a life that cannot always be pre-planned.

Moreover, fixed transit riders generally need only wait up to 10 to 20 minutes from their preferred pickup time, which is presumably the time they arrive at the bus stop or subway platform. If the bus or train is full or does not arrive as scheduled, "all the passengers have to do is wait a little longer for the next bus or train to come. Certainly no system administrator tells such a passenger that he can forget about traveling that day . . . ." *Id*. In such a scenario, fixed transit riders need not advance any additional costs. Common sense suggests this fixed route service does not seem comparable to paratransit users' experience of pickup times up to an hour earlier or later than requested, as well as an additional 30-minute wait before the ride is late enough to allow users to call to request a taxi authorization, so they can arrange an alternative ride, for which they must advance a cost significantly higher than the regular AAR fare. It is

---

[5] The Court considers relevant agency guidance to the extent persuasive. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

understandable why Plaintiffs believe the ADA mandate of "comparable" service requires more than satisfaction of the minimum criteria in the Paratransit Regulations.

Indeed, the obvious constraints often imposed on paratransit systems when compared to fixed route systems have at times puzzled courts tasked with comparing them. *See Anderson*, 337 F.3d at 209 ("Comparability seems impossible to achieve . . . ."); *Liberty Res., Inc. v. Se. Pennsylvania Transp. Auth.*, 155 F. Supp. 2d 242, 256 (E.D. Pa. 2001) ("[C]omparing constraints within a fixed route system and a paratransit system proved quite challenging to DOT . . . . [C]omparing these systems is like comparing apples and oranges because a constraint on a fixed route system never results in a patron being denied a ride altogether, absent an uncontrollable force."). Nevertheless, courts have ultimately concluded that if paratransit policies comply with the Paratransit Regulations, then those policies satisfy Section 12143 of the ADA.

In *Moore v. Niagara Frontier Transp. Auth., Inc.*, the court rejected plaintiff's argument that a paratransit service was not "comparable" where it was twice the cost of the fixed transit service but both systems had a two-bag per customer limit. No. 21-CV-1160 (LJV), 2023 WL 8718762, at *4–5 (W.D.N.Y. Dec. 18, 2023). However, the court noted the "intuitive appeal" of the argument that it is not comparable to force a paratransit user to pay twice as much as individuals without disabilities to transport the same number of bags of groceries.[6] *Id*. at *5.

---

[6] Disability community commenters pressed a similar point during the notice-and-comment period of the ADA implementing regulations. *See* 56 Fed. Reg. at 45607 ("Disability community commenters, on the other hand, opposed allowing more than the fare charged on fixed route to be charged for paratransit. A double fare was not comparable, they asserted."). DOT ultimately rejected this view "on the basis that [the higher] fare, while more than the fixed route fare, remains within bounds of comparability, and does have a reasonable relationship to the higher per-trip costs of demand-responsive service." *Id*. DOT thus concluded that "we do not believe that the [ADA] precludes a higher fare for paratransit," while simultaneously affirming that "[u]nder the [ADA], comparability is clearly viewed from the point of view of the consumer, not the provider." *Id*.

Despite the "intuitive appeal" of that argument, the court found the argument "squarely foreclosed by the governing regulations." *Id*. Because the Paratransit Regulations, specifically the Fare Price Rule, provide that the paratransit fares "shall not exceed twice the fare" charged on an entity's fixed route system, the *Moore* court concluded that the more expensive fare "clearly is permissible under the ADA and its regulations" despite its imposition on customers with disabilities. *Id*. (quoting 49 C.F.R. § 37.131). The *Moore* court viewed the ADA's comparability mandate as permitting what the Paratransit Regulations do not require; that is, the court suggested that if a paratransit policy complies with the Paratransit Regulations, then it also complies with Section 12143 of the ADA.

The Second Circuit similarly found in *Abrahams* that paratransit services exceeding the requirements of the Paratransit Regulations "provided a level of service that not only fully complied with, but substantially exceeded, what the ADA required." 644 F.3d at 113. The Circuit appears to have equated compliance with the Paratransit Regulations and compliance with the comparability requirement of the ADA. *Id*. The court in *Woods v. Centro of Oneida, Inc*. also took a similar view. No. 20-CV-539 (FJS), 2022 WL 14374734, at \*5 (N.D.N.Y. Sept. 19, 2022), *appeal docketed*, No. 22-2629 (2nd Cir. Oct. 5, 2022). In that case, the court found that a provider's policy equivalent to the Next-Day Policy complied with the ADA's requirement of paratransit service "comparable" to the service provided to individuals without disabilities and that it provided "meaningful access" to individuals with disabilities. *Id*. at \*5–6. The court interpreted the service criteria set forth in the Paratransit Regulations as "permit[ting]" the next-day policy, which the court thus found to be "ADA-compliant." *Id*. In other words, in the view of the *Woods* court, compliance with the Paratransit Regulations was not only necessary but also sufficient to satisfy the ADA's requirement of "comparable" service and "meaningful access." *Id*.

Relevant agency guidance further supports the view that Section 12143 permits what the Paratransit Regulations do not require. With respect to the Next-Day Rule, "DOT viewed 'the next-day scheduling provision' as 'a good balance of minimizing inconvenience to users and allowing providers sufficient time to schedule trips to maximize efficiency,' and viewed § 37.131(b) as requiring paratransit service providers to implement some form of next-day scheduling system." *Anderson*, 337 F.3d at 209 (quoting 56 Fed. Reg. at 45606). DOT guidance provides that "[t]he regulation explicitly allows real time scheduling to be used, though it is not mandated." 56 Fed. Reg. at 45606. The Federal Transit Administration ("FTA") concurs with this view. *See* Americans With Disabilities Act (ADA): Guidance, 2015 WL 6037995 at *161 (the "FTA Circular") ("As noted in § 37.131(b)(4), while next-day service is the base requirement, agencies have the option to adopt a policy permitting advance reservations up to 14 days before a rider's desired trip."). The FTA also considers same-day trips and "will-call" trips as forms of "premium service" exceeding the requirements of the ADA regulations and that are "optional" for transit operators to provide. *Id*. at *179 (citing 49 C.F.R. § 37.131(g)).

With respect to the One-Hour Rule, DOT guidance provides that a paratransit provider "cannot insist on scheduling a trip more than one hour earlier or later than the individual desires to travel. Any greater deviation from desired trip would exceed the bounds of comparability." 49 C.F.R. § 37 App. D. FTA guidance expounds:

> Per § 37.131(b)(2), while a transit agency may negotiate pickup times with the individual, it may not require an ADA paratransit eligible individual to schedule a trip to begin more than 1 hour before or after the individual's desired departure time. For example, if a rider requests a trip with a 9 a.m. pickup time, the regulations permit the agency to offer a pickup time between 8 a.m. and 10 a.m. This negotiation window, however, is subject to the rider's practical travel needs . . . . While § 37.131(b)(2) permits the agency to offer a pickup an hour before the requested time, doing so is not appropriate because the rider would still be working. In such instances, offering a pickup any time between 4 p.m. and 5 p.m. would be appropriate and consistent with the negotiation requirement.

FTA Circular, 2015 WL 6037995, at *161. The upshot of this guidance is the view that the One-Hour Rule permits pickup times that it does not forbid; that is, pickups of up to an hour before or after the paratransit user's requested pickup time are permitted by the ADA even though sometimes "not appropriate." *Id*.

Applying the foregoing view that compliance with the Paratransit Regulations is sufficient to satisfy Section 12143, Plaintiffs fail to state a claim that the Next-Day or One-Hour Policies violate the ADA. However, this conclusion does not foreclose claims under the ADA that Defendants do not comply with their own One-Hour Policy and thus, by extension, with the One-Hour Rule. *See, e.g.*, Compl. ¶ 103 (noting that for a 10 a.m. requested pickup time, AAR has offered Plaintiff Vega scheduled ride times as late as 11:20 a.m.). It also poses no barrier to claims of unlawful Capacity Constraints, including a pattern or practice of substantial numbers of significantly untimely pickups and excessive trip lengths, and a challenge to the 30-Minute Policy under the ADA, which the Court turns to next.

### D. The Remaining Challenged Policies and Practices Plausibly State a Claim under the ADA

The Court discusses Plaintiffs' challenges to MTA policies and practices that do not derive from the Paratransit Regulations – namely, the 30-Minute Policy and the Capacity Constraints (which include untimely pick-ups and drop-offs as well as trips of excessive length).

#### 1. 30-Minute Policy

Unlike the One-Hour Policy, which is modeled after a Paratransit Regulation, the MTA's 30-Minute Policy has no such analogue; rather, it appears to derive wholly from an FTA opinion allowing a 30-minute window around the scheduled pickup time within which the vehicle may still be considered on time:

> For practical purposes, FTA permits transit agencies to establish a reasonable "window" around the negotiated pickup time during which the vehicle may arrive and still be regarded as "on time," to account for day-to-day variability in the operation of complementary paratransit. (See Circular Section 8.5.3.) Most agencies use pickup windows, which are typically 20-30 minutes in length and are also known as on-time windows. Some agencies place the full window after negotiated times, while others "bracket" windows around negotiated times (e.g., -15/+15 window). Either approach is allowable. FTA considers pickup windows longer than 30 minutes in total to be unacceptable, because they require riders to wait an unreasonably long time for service.

FTA Circular, 2015 WL 6037995, at *162 (the "30-Minute Guidance"). Defendants' 30-Minute Policy requires users to wait 30 minutes beyond the One-Hour Policy window before the ride is considered late and, at which point, the AAR user can call and seek taxi authorization. Compl. ¶ 11.

The Court is not persuaded that the ADA or Paratransit Regulations permit the 30-Minute Policy for several reasons. First, the 30-Minute Guidance appears to have no mooring in the text of the Paratransit Regulations or the ADA. Second, as Plaintiffs allege, the 30-minute window risks creating a way to extend and exploit the One-Hour Rule that is already permitted by the Regulations. *See* Opp. at 9–10; Compl. ¶¶ 45, 48; *see also* FTA Circular, 2015 WL 6037995, at *161 (noting that the One-Hour Rule also already permits pickup times that are "not appropriate"). Third, the additional time also does not appear to be "comparable." The Court again assesses comparability from the view of a consumer. A paratransit user waiting an additional 30 minutes before a ride is late to request a taxi authorization (and then waiting for that ride to arrive) is not comparable to the experience of a fixed transit user encountering delays or a missed ride and simply waiting a short period for the next bus or train to arrive. Thus, the Court denies Defendants' motion to the extent they seek to dismiss Plaintiffs' challenge to the 30-Minute Policy under the ADA.

### 2.   Capacity Constraints

Plaintiffs allege that Defendants have engaged in a pattern or practice of untimely pick-ups and drop-offs as well as trips of excessive length. Compl. ¶¶ 11, 50–51, 54–55. The Paratransit Regulations forbid capacity constraints in the form of "any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons." 49 C.F.R. § 37.131(f)(3). This includes "substantial numbers of significantly untimely pickups for initial or return trips" and "substantial numbers of trips with excessive trip lengths." *Id.* § 37.121(f)(3)(i)(A)–(C). The Paratransit Regulations do not define what a "substantial" number means for the purposes of a capacity constraint under 49 C.F.R. § 37.121(f)(3)(i)(A)–(C). *See Anderson*, 337 F.3d at 214. Thus, the Court looks to the non-exhaustive list of factors that guided the Second Circuit in *Anderson*, namely, the number, nature and time period of the alleged capacity constraints; the changes implemented to address them; the trends, persistence, foreseeability and causes of the problems; and the reasonableness of the provider's estimates and plans. *See id*.

Defendants argue Plaintiffs have not plausibly alleged such a pattern or practice of substantial numbers of significantly untimely pickups. Mot. at 10–13. However, Plaintiffs describe a system in which passengers are left waiting for hours and often must seek taxi authorizations because AAR vehicles do not arrive in a timely manner, if it all. Compl. ¶¶ 50–54. According to Plaintiffs, this system forces many eligible paratransit users, including Individual Plaintiffs, to factor into their day several more hours of wait, travel and potential delays, or to give up on many trips entirely. *Id*. ¶¶ 17, 53, 56, 117. Plaintiff Paulino-Santos often spends 45 to 90 minutes beyond the scheduled pickup time waiting for her AAR ride to arrive and has suffered from waits as long as two and a half hours, including waiting on hold for over an hour

on the phone, before being picked up *Id*. ¶ 81–82, 85. She estimates that evening rides home from work are also late at least twice per week. *Id*. ¶ 84. When Plaintiff Paulino-Santos's ride is more than 30 minutes late or does not show up, she sometimes calls AAR for a taxi authorization – which she has used at least 15 times within a one-year period. *Id*. ¶¶ 86–87. Plaintiff Vega estimates that AAR is more than 30 minutes late for approximately 80% of her scheduled rides, and sometimes her scheduled rides do not show up at all; consequently, she calls AAR for taxi authorizations approximately 10 to 12 times per month. *Id*. ¶¶ 106–107. Member agencies of Plaintiff NYIN often spend hours on the phone inquiring about late or no-show rides scheduled to take clients to medical appointments. *Id*. ¶ 158.

Furthermore, the USAO's findings, which are incorporated in the Complaint, provide ample basis for the plausibility of the claimed Capacity Constraints. *See White v. City of New York*, No. 13-CV-7421 (KPF), 2015 WL 4601121, at *6–9 (S.D.N.Y. July 31, 2015) (relying heavily on a Department of Justice findings letter to sustain a pattern and practice *Monell* claim at the motion to dismiss stage). Relying on data provided by NYCTA, the USAO found that AAR suffered from a pattern or practice of significant untimely drop-offs (including late drop-offs and "a concerning number of very early drop-offs") and excessive travel times that "significantly limit the availability of service to ADA paratransit eligible persons." USAO Letter at 2, 4 (quoting 49 C.F.R. § 37.131(f)(3)). For example, the USAO found that paratransit travel times were excessive when compared to similar trips using the fixed route system for 78% of trips originating in Brooklyn, 91% of trips originating in Manhattan and 72% of trips originating

in Queens. *Id*. at 5. The USAO found that NYCTA failed to properly monitor[7] excessive AAR travel times. *Id*. at 4–6. The USAO concluded that the foregoing patterns or practices constitute "capacity constraints" which unlawfully limit the availability of service to ADA paratransit eligible individuals. *Id*. at 2–4. This account of systemic problems more than suffices to render it plausible that Plaintiffs' similar allegations – of significantly untimely pickups and drop-offs and excessive trip lengths – are part of a larger pattern or practice.

Defendants argue the data underlying the USAO Letter is "outdated," that the MTA "has made significant improvements to its paratransit system since that time" and that the MTA's data shows that "the vast majority of AAR pickups are timely." Mot. at 11, 15. While discovery may ultimately prove Defendants correct, whether the foregoing representations are indeed true involves factual inquiries not suitable for resolution at the motion to dismiss stage. *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106–07 (2d Cir. 2021) (finding that it is improper for the court to engage in fact finding on a motion to dismiss); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (at the motion to dismiss stage, the court accepts all the allegations in the complaint are true "even if doubtful in fact").

Plaintiffs also have alleged ride times using AAR that are up to 1.4, 2.7 and 3.2 times longer than the ride times for the same trips on the MTA's fixed transit system. Compl. ¶¶ 79–80, 104–05, 138–39. A pattern or practice of such excessive trip lengths is a Capacity Constraint under the Paratransit Regulations unless due to problems outside the MTA's control, such as weather or traffic conditions affecting all vehicular traffic that were not anticipated at the time

---

[7] *See* FTA Circular, 2015 WL 6037995, at *164 ("Transit agencies have an implicit obligation to get riders to appointments on time (not late) and an explicit obligation to monitor performance to ensure that complementary paratransit service is operated without any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons.").

trips were scheduled. *See* 49 C.F.R. § 37.131(f)(3)(ii); FTA Circular, 2015 WL 6037995, at *173 ("Allowing rides on complementary paratransit to be up to 2 hours for trips that took 1 hour by fixed route would be outside the bounds of comparability."). Plaintiffs have plausibly alleged that AAR's poor (presumably computer-generated) routing system results in illogical and unnecessarily circuitous routes, contributing to excessive trip lengths. Compl. ¶¶ 11, 55, 90, 110, 138. The USAO likewise concluded that AAR suffered from an unlawful pattern or practice of "substantial numbers of trips with excessive trip lengths" based on its comparison of AAR performance to comparable fixed route travel times. USAO Letter at 4–6. In light of the foregoing, Plaintiffs have stated a claim that the repeated, excessive trip lengths alleged here violate the ADA.

Accepting Plaintiffs' allegations as true, as the Court must at this stage, Plaintiffs have stated a claim for unlawful Capacity Constraints in the form of substantial numbers of significantly untimely pickups and drop-offs as well as trips of excessive length.

## II.    Plaintiffs Have Stated a Claim Under the Rehabilitation Act

For the same reasons set forth in the ADA analysis, Plaintiffs have also stated a claim under the Rehabilitation Act, with the exception of the facial challenges to the Next-Day and the One-Hour Policies. *See Abrahams*, 644 F.3d at 115 n.3 ("Because the ADA and the Rehabilitation Act impose nearly identical requirements, we focus on the ADA but our analysis applies to the Rehabilitation Act as well."); *Killoran v. Westhampton Beach Sch. Dist.*, No. 22-204, 2023 WL 4503278, at *2 (2d Cir. July 13, 2023) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)) ("Though there are 'subtle differences' between the ADA and the Rehabilitation Act, we generally 'treat claims under the two statutes identically,' applying the same standards to both."); 49 C.F.R. § 27.19 (the Rehabilitation Act also incorporates "all

applicable requirements of the Americans with Disabilities Act . . . including the Department [of Transportation]'s ADA regulations (49 CFR parts 37 and 38)").

### III.    Plaintiffs' NYCHRL Claim Survives Defendants' Motion to Dismiss

Federal civil rights statutes such as the ADA are "a floor below which the NYCHRL cannot fall." *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 68 (2d Cir. 2021) (internal citation omitted). Accordingly, for the reasons set forth above with respect to Plaintiffs' surviving ADA claims, those same claims also plausibly state a NYCHRL claim. However, conduct by a transit entity "that does not violate federal law may violate the NYCHRL." *Id.* The provisions of the NYCHRL must be construed "broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (internal citation omitted). Accordingly, the Court "separately and independently" analyzes whether the facial challenges to the Next-Day Policies and the One-Hour Policy state a claim under the NYCHRL. *Id.* (internal citation omitted). Before turning to the merits, the Court first addresses Defendants' preemption argument.

#### A.  Plaintiffs' NYCHRL Claim Is Not Preempted

Defendants argue that Plaintiffs' NYCHRL claim is preempted. Mot. at 18–20; Rep. at 9–10. The New York Court of Appeals has recognized that "[a] local law will be preempted either where there is a direct conflict with a state statute (conflict preemption) or where the legislature has indicated its intent to occupy the particular field (field preemption)." *Garcia v. New York City Dept. of Health & Mental Hygiene*, 106 N.E.3d 1187, 1199–200 (N.Y. 2018) (quoting *Eric M. Berman, P.C. v. City of New York*, 37 N.E.3d 82, 86 (N.Y. 2015)). Defendants submit that NYCHRL is preempted by N.Y. Pub. Auth. Law § 1266(8), which provides that local laws:

conflicting with this title or any rule or regulation of the [MTA] or its subsidiaries, or New York city transit authority or its subsidiaries, shall not be applicable to the activities or operations of the authority and its subsidiaries, and New York city transit authority, or the facilities of the [MTA] and its subsidiaries, and New York city transit authority and its subsidiaries, except such facilities that are devoted to purposes other than transportation or transit purposes.

The Second Circuit has noted that no New York court has accepted the MTA's preemption argument. *See Simmons v. New York City Transit Auth.*, 340 F. App'x 24, 27 (2d Cir. 2009) (collecting cases). Rather, "courts have noted that § 1266 only exempts the [MTA] from the reach of local laws which interfere with the accomplishment of the [MTA]'s purpose." *Id.* (internal citation and quotation marks omitted). Because complying with local human rights laws does not interfere with the [MTA]'s purpose, "those courts also reasonably concluded that the [MTA] is not exempt from the NYCHRL." *Id.*; *see also Lewis v. New York City Transit Auth.*, 12 F. Supp. 3d 418, 452 (E.D.N.Y. 2014). The Second Circuit has also stated that the MTA may be liable for discriminatory public transit service under the NYCHRL. *See Brooklyn Ctr.*, 11 F.4th at 68.

The First Department squarely rejected the MTA's preemption argument in *Ctr. for Indep. of Disabled v. Metro. Trans. Auth.*, a putative class action challenging the New York City subway system's lack of accessibility to persons with certain disabilities as discriminatory under the NYCHRL. 125 N.Y.S.3d 697 (1st Dept 2020). The First Department found that Section 1266(8)'s "limited statutory preemption only applies to laws that interfere with the accomplishment of the transit defendant[s'] transportation purposes and not to preempt the application of all local laws." *Id.* at 707. The court concluded that "[c]ompliance with the NYCHRL anti-discrimination provisions will not interfere with the transit defendants' mandate to maintain and operate the transit system." *Id.* at 707–08. That case was resolved in the

settlement the MTA announced in June 2022. Compl. ¶ 4. Here, Defendants assert the same argument that has been repeatedly rejected.

This Court likewise concludes that Plaintiffs' NYCHRL claim is not preempted. Compliance with the NYCHRL's anti-discrimination provisions, including with respect to providing transit service that does not discriminate against individuals with disabilities, does not interfere with Defendants' mandate to maintain and operate the transit system. Quite the opposite. Providing non-discriminatory service that reasonably accommodates individuals with disabilities aids in the accomplishment of Defendants' transit and transportation purposes.

### B. Plaintiffs' Challenges to the Next-Day and One-Hour Policies Plausibly Allege a NYCHRL Violation

The NYCHRL provides that it is unlawful discrimination for a provider of public accommodation like the MTA to "because of any person's . . . disability, . . . refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." *Brooklyn Ctr.*, 11 F.4th at 68 (quoting N.Y.C. Admin. Code § 8-107(4)(1)). It further requires that such an entity "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." *Am. Council of the Blind of New York, Inc. v. City of New York*, 579 F. Supp. 3d 539, 571 (S.D.N.Y. 2021) (quotation omitted). "Under the NYCHRL, a 'reasonable accommodation' means an 'accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business. The covered entity shall have the burden of proving undue hardship.'" *Id.* (internal citation omitted). The NYCHRL embodies a broader notion of which accommodations are reasonable

than the ADA; under the NYCHRL, "there are no accommodations that may be 'unreasonable' if they do not cause undue hardship." *Id*. at 572 (internal citation omitted).

The NYCHRL is a "comprehensive remedial anti-discrimination law of general application" which includes in its sweep "disability discrimination claims relative to the [public transit] system." *Ctr. for Indep. of Disabled*, 125 N.Y.S.3d at 707. It provides a vehicle for plaintiffs challenging disability discrimination in the MTA's provision of public transit services to "seek[] judicial imposition of a remedial plan to eliminate discrimination" and implementation of "a nondiscriminatory plan," just as Plaintiffs do here. *Id*. at 708.

Plaintiffs suggest that the Pilot Program, which provides paratransit service without Next-Day and One-Hour policies, is a reasonable accommodation under the NYCHRL. Opp. at 21–23. They contend that the Pilot Program is practicable and not unduly burdensome. *Id*. The Complaint also alleges that Pilot Program trips cost the MTA less than regular AAR rides. Compl. ¶ 59. Defendants counter that AAR already satisfies their obligations under the NYCHRL. Rep. at 8. This argument assumes what Defendants have the burden to prove – namely, that the accommodations Plaintiffs seek would create an undue burden such that AAR already fully satisfies NYCHRL's heightened anti-discrimination mandate. *See Am. Council of the Blind of New York*, 579 F. Supp. 3d at 571–72. While Defendants assert that expanding the Pilot Program to all AAR users would be unduly burdensome, *see* Mot. at 1, Rep. at 1, the parties' disagreement on undue burden – and, by extension, what accommodations are reasonable – involves fact-intensive inquiries not suitable for resolution at the motion to dismiss stage. *See Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 404 (E.D.N.Y. 2017) ("An inquiry about whether a certain modification or accommodation is overly burdensome or is a

fundamental alteration is necessarily fact-specific and is an affirmative defense to a prima facie claim of disability discrimination.").

As the Committee on Education and Labor predicted in 1990, it is undeniable that technological advances have "further enhance[d] options for making meaningful and effective opportunities available to individuals with disabilities." H.R. REP. NO. 101-485, at 108. Accordingly, what is required to reasonably accommodate individuals with disabilities is not static but rather "should keep pace with the rapidly changing technology of the times." *Id*. The need for reasonable accommodations to keep pace with technological developments is especially imperative under the NYCHRL, which requires more than the ADA. AAR is modeled after regulations promulgated in 1991. What was an undue burden then in many instances would not be an undue burden today. It is undeniable that sweeping technological changes have occurred since then, including the prevalence of internet-based smartphones, on-demand ride-hailing software and sophisticated GPS navigation that accounts for real-time traffic and weather conditions. It is these very technological improvements that make the Pilot Program feasible. It cannot be seriously claimed that these developments, to name only a few, have not significantly altered the landscape of what accommodations transit providers can reasonably provide to individuals with disabilities, who are entitled to paratransit service that keeps pace with the times. Yet, based on Plaintiffs' allegations, AAR appears stuck in the past.

Defendants ask the Court to downplay the broad requirements of the NYCHRL, arguing that "to support an NYCHRL claim, the plaintiffs must have been *entirely excluded* from the subway—that is, they must have had no access at all." *Brooklyn Ctr.*, 11 F.4th at 67–68 (citing *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 254 (S.D.N.Y. 2018) (emphasis added); Mot. at 17–18; Rep. at 9. This argument has not been adopted by the Second Circuit, *Brooklyn Ctr.*, 11 F.4th at

31

67–68, and the Court rejects it here. While it is certainly true that "it is a NYCHRL violation to entirely exclude a person with a disability from accessing a public accommodation," *Lowell*, 352 F. Supp. 3d at 254, it does not follow that an exclusion in substantial part but not whole, or the failure to provide reasonable accommodation, fails to state a NYCHRL violation. The notion that a transit provider must entirely exclude persons with disabilities to violate the NYCHRL falls especially flat because the ADA, "a floor below which the NYCHRL cannot fall," does not require such entire exclusion. *See Brooklyn Ctr.*, 11 F.4th at 68 (internal citation omitted). As described above, a transit provider that places limits on the availability of paratransit service and has poor service that discourages ridership – by definition not exclusions in whole – may rise to the level of violating the ADA. *See supra* Section I(D)(2).

At this stage, Plaintiffs have plausibly alleged a claim under the NYCHRL, including their challenges to the Next-Day and One-Hour Policies. The particulars of what accommodations the NYCHRL may require and what accommodations are unduly burdensome to Defendants are questions for another day.

## IV.    Plaintiff Ring Lacks Standing to Bring Suit

Finally, Defendants argue that Plaintiff Ring does not have standing to challenge the traditional AAR service because he is part of the Pilot Program. Mot. at 20–21; Rep. at 10.

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal citation omitted). The plaintiff bears the burden of establishing these elements. *Id*.

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not

32

conjectural or hypothetical." *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). A "concrete" injury is one that is "real" and "not abstract." *Spokeo, Inc.*, 578 U.S. at 340. A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id*. at 339 (internal citation omitted).

Regarding imminence, the threatened injury must be "certainly impending"; allegations of possible future injury are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). A theory of standing that "relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending." *Id*. at 410. Additionally, alleging past injury by itself is not enough to confer standing for prospective equitable relief. *See Lyons*, 461 U.S. at 102; *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."); *see also Calcano v. Swarovski North America Limited*, 36 F.4th 68, 74 (2d Cir. 2022). Past wrongs, however, are evidence "bearing on whether there is a real and immediate threat of repeated injury." *Lyons*, 461 U.S. at 102 (quoting *O'Shea*, 414 U.S. at 676) (internal quotation marks omitted).

Here, although Plaintiff Ring alleges past injury, he does not demonstrate current injury or that future injury is "certainly impending." *Clapper*, 568 U.S. at 409. Between 2014 and 2018, Mr. Ring used the traditional AAR service, but since 2018 has been part of the Pilot Program. Compl. ¶¶ 121–22. Mr. Ring does not allege he has suffered any injury since being accepted into the Pilot Program and, in fact, states that he can now travel much more frequently, including taking multiple trips per day when needed, affording him greater flexibility and spontaneity. *Id*.

¶¶ 142, 145. While Mr. Ring is afraid the MTA may curtail the Pilot Program, *id.* ¶ 146, and Plaintiffs allege that the MTA has previously threatened to end or limit on-demand access, *id.* ¶¶ 16, 63, there are no facts in the Complaint that suggest any injury to Plaintiff Ring that is "certainly impending." *Clapper*, 568 U.S. at 409; *see also Valentine v. Washington Nationals Baseball Club, LLC*, No. 22-CV-1299 (TJK), 2023 WL 346099, at *3–4 (D.D.C. 2023) (holding that plaintiff seeking injunctive relief under the ADA lacked standing to challenge a policy that had been discontinued because the mere possibility that the policy could be reinstated was not sufficient to show an imminent threat of injury).

Plaintiffs challenge the traditional AAR service, not the Pilot Program (either before or after the new rules capping the number of monthly rides per user and increasing the customer co-pay). In fact, Plaintiffs point to the Pilot Program as a model for the relief they seek. Opp. at 3, 21. Plaintiff Ring does not claim to suffer from any of the Challenged Policies, which are all specific to the traditional AAR service. In short, he would not "be remedied by a decision in his favor." *Woods*, 2022 WL 14374734, at *2. Because Plaintiff Ring is already part of the Pilot Program and does not plead any present injury or future injury that is "certainly impending," he lacks standing to pursue injunctive relief with respect to the traditional AAR program. *Clapper*, 568 U.S. at 409.

Because Defendants do not challenge the standing of Plaintiffs Paulino-Santos, Vega and NYIN, this case may proceed. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."). And although Plaintiff Ring is dismissed from this action, his experiences, along with those of other participants in the Pilot Program, remain relevant to Plaintiffs' claims.

## CONCLUSION

For the reasons set forth herein, Plaintiffs fail to state a claim that the Next-Day Policies and One-Hour Policy on their face violate the ADA. In this respect, Defendants' motion to dismiss is GRANTED; in all other respects, the Rule 12(b)(6) motion is DENIED. Because Plaintiff Ring lacks standing, Defendant's Rule 12(b)(1) motion is GRANTED.

The Clerk of Court is directed to terminate ECF No. 34.

Dated: March 29, 2024
       New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

35